**Kari Johnson SUNDSTROM, et al., Plaintiffs,**

v.

**McDONNELL DOUGLAS CORPORATION, et al., Defendants.**

**Civ. No. C–91–0316 MHP.**

United States District Court, N.D. California.

Jan. 8, 1992.

John J. Ruprecht, Fort Bragg, CA, Sam D. Delich, Flynn Delich & Wise, San Francisco, CA, for Kari J. Sundstrom, et al.

Marvin D. Morgenstein, Lisa M. Frlekin, Morgenstein & Jubelirer, San Francisco, CA, Percy Anderson, Bryan Cave, Los Angeles, CA, for McDonnell Douglas Corp.

Lisa M. Frlekin, Morgenstein & Jubelirer, Robert C. Gebhardt, Bronson Bronson & McKinnon, San Francisco, CA, for General Dynamics Corp.

## MEMORANDUM AND ORDER

PATEL, District Judge.

This action arises from the mid-air collision of two General Dynamics Corporation F–16C fighter aircraft that killed United States Air Force ("USAF") First Lieutenant Steven Sundstrom. Plaintiffs Kari Sundstrom, the widow of the decedent, and Daniel James Sundstrom and Kristin Nicole Sundstrom, the decedent's two children, bring this action for wrongful death against defendants McDonnell Douglas Corporation ("MCD") and General Dynamics ("GD"). Plaintiffs allege defective design, manufacture, and assembly of aircraft components by the defendants as well as negligence and misrepresentation. Defendants have moved for summary judgment, asserting the government contractor defense enunciated by the Supreme Court in *Boyle v. United Technologies Corp.*, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). Plaintiffs have filed a cross-motion for summary adjudication on the government contractor defense issue. Plaintiffs contend that the government contractor defense should be stricken and that the jury not be instructed at trial on this defense. Alternatively, plaintiffs move for continued discovery under Rule 56(f). Having considered the submissions and oral arguments of the parties, and for the following reasons, the court GRANTS partial summary judgment for defendants. Summary judgment is granted on the first two prongs of the *Boyle* test. Plaintiffs are allowed limited discovery under Rule 56(b) on the third, "failure to warn" prong of the *Boyle* test. Plaintiffs' cross-motion for summary adjudication on the government contractor defense is DENIED.[1]

---

1. On November 8, 1991, plaintiffs filed a "Reply to Oppositions by Defendants General Dynamics Corporation and McDonnell Douglas Corporation to Plaintiffs' Cross-motions for Summary Adjudication of Issues." This "reply" to defendants' alleged opposition is inappropriate, as were the plaintiffs' cross-motions themselves. Plaintiffs' cross-motions were based on the same theories as their oppositions to defendants' motions for summary judgment. Defendants' motion to strike plaintiffs' reply is granted.

Each party to this case has filed motions to strike evidence offered by opposing parties. The court need not consider the merits of the majority of these motions. To the extent the court has considered any evidence to which an objection has been filed, its analysis is noted in its opinion.

On November 13, 1991, plaintiffs also filed a last minute, untimely declaration purporting to establish government *disapproval* of the ECP 106. The Aeronautical Systems Division 46 Form states in part: "Subject: ECP 0106CB, Install Flight Control System Data Recorder [¶] 1. Subject ECP has been disapproved by the MCCB, 19 June 1981, for being cost excessive,

BACKGROUND

On December 18, 1989, during a training mission in Germany, two F–16C aircraft were involved in a mid-air collision. The impact of the crash destroyed the left wing of decedent's aircraft and sheared off its left horizontal stabilizer. Joint Statement of Undisputed Facts Between General Dynamics and Plaintiffs ("GD Joint Statement") ¶ 1. The pilot of one of the F–16C aircraft was able to eject·successfully from the aircraft. The pilot of the other aircraft, plaintiffs' decedent, ejected unsuccessfully. *Id.* Defendant GD designs and manufactures F–16C aircraft. Defendant MDC, through its subdivision Douglas Aircraft Company ("Douglas"), designs and manufactures the ACES–II ejection seat system used in F–16 aircraft. The F–16C aircraft in this collision had ACES–II ejection seats. GD Joint Statement ¶ 1.

After the decedent ejected from his aircraft, the lines of his drogue stabilizing parachute became tangled between the side of the ejection seat ("fairing") and the electrical disconnect fitting of a seat data recorder which was mounted on the left side of the ejection seat. GD Joint Statement ¶ 2. Lt. Sundstrom fell to his death. Joint Statement of Facts Between McDonnell Douglas and Plaintiffs ("MCD Joint Statement") ¶ 4. The parties dispute the reason for the entanglement. Relying on the declaration of Edward Flora, plaintiffs maintain that the entanglement occurred because the ejection seat fairing buckled into the seat data recorder. Flora Dec. ¶¶ 8–9. Defendants deny that buckling caused the parachute entanglement; they contend that the entanglement was caused by the adverse movement of the decedent's aircraft following collision. Nonetheless, for the purposes of their summary judgment motions, defendants accept plaintiffs' statement regarding that seat buckling caused the entanglement.

Although the parties' submissions discuss the history of the F–16 and the ACES–II at great length, only a brief history is necessary to decide the issues presented in this case. In the early 1970's, the USAF F–16 System Program Office ("F–16 SPO") was formed to design a new generation of fighter aircraft. GD Joint Statement ¶ 3. The F–16 SPO then submitted Requests for Proposal to American aircraft manufacturers, including General Dynamics. The contract for the production model of the F–16 was awarded to GD. *Id.* GD developed detailed design specifications for the production of the F–16. The requirements for the F–16A aircraft (a single-seat aircraft) are set forth in air vehicle specification 16PS002 (and subsequent revisions) and for the F–16B (a two-seat aircraft) in air vehicle specification 16PS005 (and subsequent revisions). *Id.* at ¶ 4.

The air vehicle specifications for the F–16 include various components termed "Government Furnished Aeronautical Equipment" ("GFAE"). GD was required to install such components into the F–16 aircraft as they were supplied by the Air Force. The F–16 SPO coordinated with other Air Force organizations responsible for procuring GFAE components. GD Joint Statement ¶ 8. In 1976, the Life Support System Program Office ("Life Support SPO") was set up. It was involved in the development and verification of a GFAE seat ejection system that was to be incorporated into the F–16 crew escape system. The F–16 SPO coordinated the integration of this ejection system into the aircraft. *Id.*

After competitive testing and GD's evaluation of the efforts necessary to install each seat, the MDC ACES–II ejection seat was chosen. Air Force personnel were given the responsibility for reviewing the design and manufacture of the ACES II ejection seat.

therefore, subject ECP is cancelled." The document is signed by William Tully, the Assistant System Program Director for the F–16 SPO and Carolyn Bowling, a Contracting Officer. Declaration of James Curran Re USAF Disapproval of ECP 0106, ex. A. However, as defendant GD notes in its response to this declaration, the 0106C8 document concerns a GD proposal to modify and retrofit a ground testing device in

order to facilitate maintenance of the electronic component assembly, one of the three flight control devices covered by ECP 0106. The document has nothing to do with the seat data recorder. To the extent that plaintiffs were aware of this information before they submitted the document to the court, their submission is deliberately misleading.

MDC Joint Statement ¶ 23. The F–16A with the ACES–II ejection system installed was tested at Holloman Air Force Base in 1978. The testing was performed pursuant to a test plan reviewed and approved by the F–16 SPO and F–16 SPO representatives were present at these sled tests. GD Joint Statement ¶ 11. A report prepared by GD noted any anomalies in the performance of the ACES–II ejection system and reported them to the F–16 SPO. *Id.* No seat data recorder was mounted on the ACES–II seat ejection system used in the 1978 tests. *Id.*

After several years of production of the original F–16A and F–16B models, the F–16C and F–16D models were produced. The F–16C, like the F–16A, is a single-seat model. In 1986 and 1988–89, further sled tests were conducted by GD on the ACES–II ejection seat incorporated into the F–16C and F–16D models. No seat data recorder was attached to the ejection seat during these tests. GD Joint Statement ¶ 11.

In the late 1970s, the Air Force and GD developed a program to preserve F–16 flight data for later analysis. Two memory components of this program would be incorporated into existing flight control system components. A third memory component, designed primarily for accident analysis, would be attached to the ACES–II ejection seat. This third memory component would increase the chances that flight data could be retrieved intact following an aircraft accident. After study and evaluation, the Air Force issued Advanced Change/Study Notice ("ACSN") 711. ACSN 711 directed GD to prepare and submit an Engineering Change Proposal ("ECP") for production and incorporation of a flight control seat data recorder. GD Joint Statement ¶ 14.

In January 1979, GD issued ECP 106, which called for the installation of a Flight Data Recorder on the F–16 ACES II ejection seat. In March 1979, the Air Force notified MDC's subdivision Douglas that GD had issued ECP 106. The Air Force directed Douglas to evaluate and comment on the impact of the installation of the flight data recorder on ejection seat performance. MDC Joint Statement ¶ 13, ex. 1. In July 1979, GD forwarded to Douglas drawings of the original proposed installation of the F–16 flight data recorder. MDC Joint Statement ¶ 15. MDC's ACES II production contract was formally modified to direct Douglas to prepare Engineering Change Proposal ("ECP") 106 to reflect the impact of the seat data recorder on ejection seat performance. MDC Joint Statement ¶ 17, ex. 2. Because of the anticipated attachment of the recorder to th GFAE ACES–II Ejection Seat, the Life Support SPO was also involved in evaluating the recorder. GD Joint Statement ¶ 14.

On March 12, 1980, a copy of the Douglas study was sent to John Glaser, Air Force Contracting Officer for the ACES II ejection seat system. MDC Joint Statement ¶ 18. Subsequent letters exchanged between Douglas, GD, and the Air Force discussed engineering changes to the attachment of the seat data recorder occasioned by Douglas' fear that the positioning of the original attachment might cause the ejection seat fairing to buckle. MDC Joint Statement ¶¶ 19, 20.

The Configuration Control Board, an entity within the F–16 SPO, maintains control over F–16 specifications and changes thereto. It is composed of representatives of technical organizations within the F–16 SPO. Miller Dec. ¶¶ 2, 4. After receiving input from various Air Force engineers and GD personnel, the Configuration Control Board approved ECP 106. Dabold Dec. ¶ 7; Bailey Dec. ¶ 10; Miller Dec. ¶ 9.

The seat data recorder was incorporated into the vehicle specifications for the F–16A and F–16B aircraft. Hudson Aff., ex. 1 at I–202; Hudson Aff., ex. 2 at I–208. It also became part of F–16C vehicle specifications when that aircraft was developed. Hudson Aff., ex. 3 at I–152.

Defendant MDC is not involved in the installation of the seat data recorder. ACES II ejection seats are delivered directly to the government without the flight data recorder or its supporting hardware. MDC Joint Statement ¶ 24. Plaintiffs have brought this wrongful death action against MDC and GD for their role in developing an allegedly faulty seat ejection system. Defendants have moved for summary judgment on the

grounds that plaintiff's action is barred by the government contractor defense.

LEGAL STANDARD

■ Under Federal Rule of Civil Procedure 56, summary judgment shall be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ... since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). *See also T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987) (the nonmoving party may not rely on the pleadings but must present specific facts creating a genuine issue of material fact); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

The court's function, however, is not to make credibility determinations. *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511. The inferences to be drawn from the facts must be viewed in a light most favorable to the party opposing the motion. *T.W. Elec. Serv.*, 809 F.2d at 631.

DISCUSSION

I. THE BOYLE STANDARD

■ Under the standard enunciated by the Supreme Court in *Boyle v. United Technologies Corporation*, 487 U.S. 500, 512, 108 S.Ct. 2510, 2518, 101 L.Ed.2d 442 (1988), liability for design defects in military equipment cannot be imposed pursuant to state law when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States. Plaintiffs contend that defendants have failed to prove the three elements of the *Boyle* government contractor defense.

A. *Approval of Reasonably Precise Specifications*

■ To satisfy the first requirement of the *Boyle* test, the government must do more than merely accept the contractor's choice of design. It must examine and agree to a detailed description of the workings of the system. *McKay v. Rockwell International Corp.*, 704 F.2d 444, 450 (9th Cir.1983), cert. denied, 464 U.S. 1043, 104 S.Ct. 711, 79 L.Ed.2d 175 (1984). Mere "rubber stamp" approval is not sufficient to satisfy the *Boyle* test. *Trevino v. General Dynamics Corp.*, 865 F.2d 1474, 1480–85 (5th Cir.), cert. denied, 493 U.S. 935, 110 S.Ct. 327, 107 L.Ed.2d 317 (1989). The defendant asserting the government contractor defense has the burden of proving government approval by a preponderance of the evidence. *McKay*, 704 F.2d at 453.

In this case, the Air Force authorized ECP 106 for the development of a seat data recorder. Air Force engineers were significantly involved in the evaluation of the seat data recorder. The Air Force also directed Douglas to study the impact of the ECP 106 SDR modification. On March 12, 1980, in response to the contract modification, a copy of the MDC study was forwarded to the Air Force. The study found that the seat structure could withstand the added weight of the seat recorder providing "minor revisions" were made to the installation. MDC Joint Statement ¶ 18, ex. 3. Appendix II of the study contained a Douglas drawing dated February 21, 1980 which showed the proposed changes. *Id.*

At the direction of GD Escape Systems Design Group engineer C. Gene Spriggs, GD engineers revised GD engineering drawings on the seat data recorder attachment. Spriggs Dec. ¶ 8. Spriggs was acting on information he had received that the F–16 SPO and Douglas were concerned about the structural effects of the SDR installation.[2]

---

**2.** Plaintiffs object that Spriggs' statements about F–16 SPO and MDC regarding the seat data recorder installation are inadmissible hearsay. However, these statements are not offered for the truth of the matter asserted. Rather, they help to establish Spriggs' motivation for revising engi-

The changes made by GD engineers provided additional stiffness to the side panel of the ejection seat in the area where the seat data recorder would be attached. Brackets, channel, clips, and doublers were added. The GD engineers' changes are illustrated in engineering drawings 16K0384, 16K0385, 16K0386. *Id.* at ¶ 8–10.

These drawings were sent to MDC along with a letter from W.W. Woodward, the Engineering Chief of the Escape Systems Division of General Dynamics. In the letter, GD stated that the revised designs for the SDR attachment resulted from conversations with MDC engineers which "revealed the fact that the original installation would not withstand a 40g drogue load without buckling the fairing that the recorder was attached to." The letter shows a "cc" to Alan Bailey, then a project engineer at the F–16 SPO. MDC Joint Statement ¶ 19, ex. 4.

In a September 8, 1980 letter to John Glaser, the Air Force Contracting Officer for the ACES II ejection seat, Mr. Carlyle, the MDC program manager at the time, stated that the revised GD drawings had been found acceptable by Douglas. The letter also stated that the flight data recorder was being incorporated by modification to the ACES II seat after receipt of this seat at GD. MDC Joint Statement, ex. 5.

■ Plaintiffs assert that the first prong of *Boyle* has not been satisfied since no definitive evidence has been found that the Air Force explicitly *approved* the final GD drawings. They note that defendants' only support for such explicit approval is a statement by GD engineer Spriggs that he had "received word" from the F–16 SPO that the revised engineering drawings had been approved. As plaintiffs correctly assert, rumors of approval are hearsay and thus are incompetent evidence.

However, despite the lack of explicit evidence of final approval, such approval can be inferred from continuous government involvement in the seat data recorder addition that goes beyond the "rubber stamping" crit-

icized in *Trevino v. General Dynamics Corp.* In *Trevino,* the government merely signed off on diving hangar designs conceived and developed by General Dynamics. General Dynamics assumed full responsibility for all technical research, inspection, and quality assurance of its work product. 865 F.2d at 1476–77.

By contrast, in this case, the exchange of information between the Air Force and defendants was of the type required by the first prong of the *Boyle* test. *See Ramey v. Martin–Baker Aircraft Co.,* 874 F.2d 946, 950 (4th Cir.1989). General Dynamics had no authority to make unilateral changes to the configuration of the seat. GD Joint Statement ¶ 10. The Air Force initiated the flight data recorder project, evaluated it, and directed Douglas to evaluate it. The technical experts of the F–16 SPO Configuration Control Board then approved ECP 106. The Air Force also had sufficient information to approve the specifications; it was given substantial information regarding the possibility of buckling and the engineering changes necessary to avert such a possibility. In addition, F–16 SPO project engineer Alan Bailey examined the actual seat data recorder as installed on the ACES II ejection seat in the F–16A and F–16B aircraft. Bailey Dec. ¶ 10.

Plaintiffs also assert that both GD and MDC had actual knowledge in 1980 that seat data recorder installation could cause seat buckling that could *in turn* entangle drogue parachute lines if ejection were necessary. Plaintiffs contend that since defendants failed adequately to warn the government of the danger of parachute line entanglement, the government could not and did not approve reasonably precise SDR specifications. However, plaintiffs' allegations do not go to the question of reasonable precision; indeed, the detailed engineering drawings provided to the Air Force by defendants GD and MDC were more than "reasonably precise." Plaintiffs' allegations involve the failure to warn prong of the *Boyle* test and will be discussed below.

neering drawings that GD enginners had already prepared and sent to MDC and the Air Force.

Spriggs Dec. ¶ 6, ex. 2.

Accordingly, defendants GD and MDC are granted summary judgment on the first prong of the *Boyle* test.

### B. Conformity to Applicable Specifications

Plaintiffs assert that the ACES–II design, as modified by the GD seat data recorder design, failed to conform to various applicable specifications, and thus defendants have failed to satisfy the second prong of the *Boyle* defense.

#### 1. MIL–S–9479B

■ Military Specification 9479B ("MIL–S–9479B") establishes a "functional baseline" for the ACES–II ejection system. MDC Joint Statement ¶ 22. Plaintiffs claim violations by defendants MDC and GD of section 3.5.2 of MIL–S–9479B, which requires that:

> The seat system shall be free of any projections or sharp edges which could snag, jam, or damage clothing and equipment, injure the seat occupant or maintenance personnel, foul personal equipment, jeopardize operation of seat components, or interfere with recovery parachute operation.

*Curran Dec.*, ex. C at 18. Section 3.3.4 of Prime Item Development Specification 412A–88277–55103A, which modifies the MIL–S–9479B specification, also prohibits such snags or projections.

Defendant GD and plaintiffs dispute whether MIL–S–9479B is applicable to the seat data recorder modification or whether it applies simply to the seat as delivered by MDC to the Air Force. This dispute misses the point. As defendant MDC correctly points out, a proscription against projections which would snag equipment is simply not the type of "reasonably precise specification" to which the *Boyle* test refers. Requiring a government contractor to conform its product to qualitative, precatory goals would entirely vitiate the *Boyle* defense. *Kleemann v. McDonnell Douglas Corporation*, 890 F.2d 698, 700–01 (4th Cir.1989), *cert. denied*, 495 U.S. 953, 110 S.Ct. 2219, 109 L.Ed.2d 545 (1990). In *Kleemann*, the specification at issue required landing gear to withstand normal loads without bending, unlocking, or causing uncontrolled motion of the aircraft. Although the landing gear failed to meet this general standard, the evidence showed that the gear did conform to detailed engineering drawings approved and modified by the Navy. Because there was active governmental oversight at the various stages of development, the government contractor defense was properly invoked. Similarly, in this case, the issue is whether the government had the information to examine actively the safety of the proposed seat data recorder projection, and whether it did so, not whether the seat data recorder projection met some qualitative standard of safety developed for the seat system as a whole.

Thus, defendants GD and MDC may properly invoke the government contractor defense against plaintiffs' allegation of MIL–S–9479B violation.

#### 2. Testing Requirements

■ Plaintiffs assert that defendant General Dynamics violated Specification 16PS058A, which governs the manufacture and production of the F–16C aircraft. Specification 16PS058A requires sled testing in accordance with Military Standard 846C. ("MIL–STD–846C"). Specifically, 16PS058A requires systems integration testing of the crew escape system. *Curran Decl.*, ex. K, ¶ 4.2.4.12.2, at 305. Plaintiffs further point out that under Section 4.5.3 of the MIL–STD–846C, these systems integration tests are required to "duplicate the crew station configuration of the actual aircraft as far as representing critical ejection clearances ..." *Bach Dec.*, ex. B. Plaintiffs contend that GD violated these provisions by failing to attach the SDR modification to the ACES–II seat used in its May 1986 and 1988–1989 sled tests. Plaintiffs provide photographs which document the lack of SDR modification. *Curran Decl.*, ex. G at 49, 52.

Defendant General Dynamics contends that, under 16PS058A, further qualification testing of the crew escape system was not required because of prior successful tests of this system with the F–16A. They note that ¶ 3.7.1.9.9 of the quality assurance section of Specification 16PS058A waives the system integration testing requirement (¶ 4.2.4.12.2) cited by plaintiffs. This waiver states that

verification of the system is not required since the system is "common to the USAF F–16A." The requisite systems integration testing of the crew escape system had already been performed for the F–16A. Hudson Aff. ex. 3 at I–171 to I–172. For the purposes of the government contractor defense, the fact that the tests of the F–16A were done without the seat data recorder attachment is irrelevant. The Air Force clearly made a determination that the 1978 testing sufficiently assured the quality of the F–16C aircraft crew escape system, even with the new seat data recorder attachment.

Therefore, defendant GD is correct in asserting that Air Force specifications did not mandate further testing of the crew escape system. Only if such further testing *had* been required would the crew station configuration have had to be similar to that of the actual aircraft. The fact that General Dynamics conducted systems integration tests in 1986 and 1988–89 without incorporating the seat data recorder is wholly irrelevant to the *Boyle* standard of conformity with applicable testing requirements.[3]

### 3. Performance Specifications

■ Plaintiffs assert that General Dynamics violated a section of Specification 16PS058 which requires that the open ejection seat provide fully automatic, safe escape from zero altitude/zero airspeed up to 600 knots equivalent airspeed. Curran Dec., ex. K, ¶ 3.7.1.9.9.1, at 130. Plaintiffs assert that since Table V of this section provides roll and pitch attitudes at which safe escape should be possible at low altitudes, safe escape is to be provided at *all* roll and pitch attitudes at higher altitudes.

It is undisputed that the decedent's aircraft had lost such major structural components as its left wing and left horizontal stabilizer when the decedent ejected. Plaintiffs appear to be claiming that the requirement for safe escape bars defendant GD from asserting the *Boyle* defense regardless of what happened to the aircraft, as long as it was operating under 600 knots and over a certain altitude. Demand for compliance

with so general a standard is barred under *Kleemann.*

Plaintiffs also claim that defendant GD violated similar performance requirements under MIL–S–9479B. Again, a requirement that safe escape be provided whenever an aircraft operates above a certain altitude and above a certain speed is not the type of reasonably precise, quantitative specification to which the *Boyle* test refers.

### 4. GD's Duty Under MIL–STD–882

Plaintiffs claim that defendant GD violated its duty under MIL–S–9479 to comply with the requirements of MIL–STD–882. Curran Dec., ex. C, ¶ 3.4.16 at 18. One of these requirements involves performing a Preliminary Hazard Analysis to evaluate hazards, including the effect of equipment layout and life support requirements. MIL–STD–882B, Bach Dec. ex. at 157–58. However, plaintiffs have presented no evidence that MIL–S–9479, which governs the *production* of the ACES–II ejection seat, applies to defendant GD. Defendant GD simply receives the ACES–II as Government Furnished Aeronautical equipment. Similarly, MIL–STD–882B is not contained in Air Vehicle Specification 16PS058, which governs the production of the F–16C aircraft.

### 5. MDC Drawing

Plaintiffs assert that the installation of the seat data recorder on the seat at issue in this case did not conform to the MDC drawing attached as Exhibit 2 to MDC's March 12, 1980 evaluation of the seat data recorder attachment. However, this drawing does not create a design requirement; indeed, MDC was in no way responsible for seat data recorder installation. The drawing merely suggests a possible revision to the seat data recorder installation. In addition, as discussed above, GD engineer Spriggs asserts that he responded to MDC's concerns about the structural integrity of the seat data recorder installation by making various changes to GD engineering drawings. These drawings were then forwarded to the Air Force.

---

**3.** Because it has determined that General Dynamics had no duty to test at all, the court need not resolve the parties' dispute over whether

General Dynamics' 1986 and 1988–89 tests were conducted for the benefit of the Air Force.

### C. Failure to Warn

■ Under the third prong of *Boyle*, the government contractor defense must fail if the defense contractor fails to warn the government of any defects with respect to which it has more knowledge than the government. Both defendants had a duty to provide to the government all knowledge they had regarding the effects of the seat data recorder on the ACES–II ejection seat. Defendant GD was responsible for installing the seat data recorder and defendant MDC had entered into a contract with the Air Force directing MDC to prepare an ECP evaluating the seat data recorder's impact.

As evidence that defendants had more knowledge than the government of the potential for parachute entanglement, plaintiffs offer a GD engineer's drawing dated February 11, 1980. This drawing states that MDC had expressed concern that seat buckling could cause parachute entanglement. Spriggs Dec., ex. 6. There is no evidence that this drawing was ever sent to the Air Force and, indeed, defendant GD denies that it was. Spriggs Dec. ¶ 15.

The drawing suggests that both MDC and GD had actual knowledge that seat buckling could cause parachute entanglement. Although the drawing's statement constitutes inadmissible hearsay with respect to MDC's knowledge, MDC does not contest its knowledge of the danger. Rather, at oral argument, both defendants relied on the declaration of a Robert Billings as evidence that information regarding the potential for parachute entanglement was provided to the Air Force.

Billings worked on the ACES II Ejection Seat during the period between 1974 and mid–1982 as an employee of the Air Force Life Support SPO. Declaration of Robert Billings in Support of the Reply of McDonnell Douglas Corp. ("Billings Dec."), ¶ 3. Billings asserts that during the course of the Douglas study on the impact of seat data recorder on the F–16 ACES II Ejection Seat, Douglas advised the Air Force that "the original installation as proposed by General Dynamics Corporation may not withstand a 40g deceleration drogue load without buckling the fairing on the side of the seat."

Billings Dec. ¶ 5. Billings also states that "Douglas believed that if the fairing buckled the personnel parachute suspension lines could become trapped within the personnel parachute housing." *Id.*

Billings' statements constitute evidence that the Air Force may have been informed that seat buckling could cause parachute entanglement. However, it is not clear when or how Douglas informed the Air Force of its suspicions regarding parachute entanglement, or if it did so at all. The court cannot grant defendants GD and MDC summary judgment on the failure to warn question simply on the basis of Billings' declaration. Therefore, limited discovery on the failure to warn question will be allowed as discussed below.

### II. PLAINTIFFS' 56(f) MOTION FOR DISCOVERY EXTENSION

■ As an alternative to denial of defendants' summary judgment motion, plaintiffs move for an extension of the discovery period under Federal Rule of Civil Procedure 56(f). Rule 56(f) requires affidavits which specifically set forth the information sought and how it would preclude summary judgment by creating a genuine issue of material fact. *Hall v. Hawaii*, 791 F.2d 759, 761 (9th Cir.1986). Plaintiffs' Rule 56(f) motion is granted on the remaining genuinely disputed issue: whether the Air Force was warned that seat buckling could result in parachute entanglement. Plaintiffs are thus given leave to depose Billings on this issue. After Billings has been deposed, the parties shall contact the court regarding further briefing on the third prong of *Boyle*. If plaintiffs can show that further depositions are necessary before the briefing, they shall submit a declaration setting forth the depositions required and the reasons for them.

### CONCLUSION

1. For the foregoing reasons, the court GRANTS summary judgment for defendants on the first two prongs of the *Boyle* test.

2. The court DENIES plaintiffs' cross-motion for summary adjudication on the issues.

3. Plaintiffs' Rule 56(f) motion for further discovery with respect to the third prong of the *Boyle* test is GRANTED.

4. Plaintiffs are allowed to depose Mr. Billings on the single question of failure to warn that seat buckling could cause parachute entanglement.

IT IS SO ORDERED.