**BURLINGTON NORTHERN SANTA FE RAILROAD COMPANY, a Delaware corporation, Plaintiff–Appellee,**

v.

**THE ASSINIBOINE AND SIOUX TRIBES OF THE FORT PECK RESERVATION, Montana; Arlyn Headdress, chairman of the Fort Peck Tribal Executive Board; Mervyn Shields, Director, Tax Department of the Assiniboine and Sioux Tribes, Defendants–Appellants.**

No. 01–35681.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 10, 2002.

Filed March 17, 2003.

Reid Peyton Chambers, Sonosky, Chambers, Sachse, Endreson & Perry, Washington, DC, for the defendants-appellants.

Neil G. Westesen, Crowley, Haughey, Hanson, Toole & Dietrich, P.L.L.P., and Charles G. Cole, Steptoe & Johnson LLP, Washington, DC, for the plaintiff-appellee.

Before BEEZER, GOULD, and BERZON, Circuit Judges.

Opinion by Judge BERZON; Concurrence by Judge GOULD.

## OPINION

BERZON, Circuit Judge.

### BACKGROUND

The Burlington Northern Santa Fe Railroad Company ("BN" or "the Company"), a non-Indian corporation, runs a rail line that crosses over 80 miles of the Fort Peck Indian Reservation ("the Reservation"), governed by the Assiniboine and Sioux Tribes ("the Tribes"). The rail line is built on a right-of-way granted by Congress in 1887 to BN's predecessor-in-interest. Act of Feb. 15, 1887, ch. 130, 24 Stat. 402. BN runs an average of 26 trains per day over the rail line through the Reservation, totaling more than 619,000 cars in 2000.

We are asked to decide if the Tribes may continue to impose on BN an ad valorem tax levied on the value of "all utility property," defined as including "any publicly or privately owned railroad." *See* the Tribes' *Comprehensive Code of Jus-*

*tice,* tit. XXIII, §§ 301–05; *Quinault Indian Nation v. Grays Harbor County,* 310 F.3d 645, 647 n. 1 (9th Cir.2002) (an ad valorem tax is imposed on the value of property). The Tribes have, since 1987, imposed the annual tax (currently 4%) on BN, which paid it from 1987 to 1999.

The Company brought an immediate challenge to the tax when it was first imposed on the same right-of-way at issue now, but lost. *See Burlington N. R.R. v. Blackfeet Tribe of Blackfeet Indian Reservation,* 924 F.2d 899 (9th Cir.1991) (*Burlington I* ), *cert. denied,* 505 U.S. 1212, 112 S.Ct. 3013, 120 L.Ed.2d 887 (1992). *Burlington I* held that the congressionally-conferred right-of-way used by BN was on trust land and that the ad valorem tax was therefore valid. In 1997, however, the Supreme Court held, in *Strate v. A–1 Contractors,* 520 U.S. 438, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997), that a right-of-way granted by the federal government and crossing through Indian trust land is the equivalent of non-Indian fee land. Following *Strate,* this Court, in *Big Horn County Elec. Coop. v. Adams,* 219 F.3d 944, 953 (9th Cir.2000), addressed the vitality of *Burlington I* and held: "[I]n light of *Strate,* [*Burlington I* ] is overruled to the extent it upholds an ad valorem tax on property located on a congressionally-granted right-of-way." [1]

After *Big Horn,* BN stopped paying the Tribes' ad valorem tax. The Company agreed to a settlement with the Tribes through 2000 and provided that unless the tax were upheld by a court of competent jurisdiction, no further payments would be forthcoming. On February 1, 2001, the Tribes filed suit against BN in Fort Peck Tribal Court, seeking a declaration that the tax is valid. Soon thereafter, on Feb-

ruary 22, 2001, BN filed this case in federal district court. Almost immediately—on March 19, 2001—BN moved for summary judgment. The Tribal Court, in which preliminary discovery and other pretrial proceedings had begun, then declined to schedule a trial until "the federal courts have determined whether tribal remedies must be exhausted." After the district court granted BN's motion for summary judgment, the Tribal Court stayed all its proceedings pending this appeal.

In granting BN's motion for summary judgment and permanently enjoining the Tribes from acting on the tax, the district court held that our cases after *Strate* require that the right-of-way in question be viewed as non-Indian fee land and therefore as presumptively exempt from the Tribes' civil authority, citing *Montana v. United States,* 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981). The district court went on to find that neither exception to this principle recognized in *Montana* applies because (1) the Tribes had not established a consensual relationship with BN "sufficient to justify the property tax;" and (2) the Tribes' contentions concerning the potentially dangerous impact of BN's at-times hazardous cargo were "nothing more than a recharacterization of the Tribes' argument that the generalized availability of tribal services is sufficient to support the tax." Without comment, the district court denied all other pending motions, including the Tribes' request for discovery under Federal Rule of Civil Procedure 56(f), although the court did provide that its "permanent injunction shall become void, if in the future . . . one or both of the *Montana* exceptions are established."

---

1. *Big Horn* drew on a case decided in 1999, *Burlington N. R.R. v. Red Wolf,* 196 F.3d 1059 (9th Cir.1999), which treated a BN right-of-way over a different Indian reservation as non-Indian fee land.

## DISCUSSION

■ Reviewing the district court's grant of summary judgment de novo, *Big Horn,* 219 F.3d at 949, and viewing the evidence in the light most favorable to the nonmoving party, we must determine whether the district court correctly applied the relevant substantive law and whether there are any genuine issues of material fact. *Balint v. Carson City,* 180 F.3d 1047, 1050 (9th Cir. 1999). We affirm most of the district court's grant of summary judgment but hold that the Tribes should be permitted some discovery concerning whether BN's activities so threaten their political integrity, economic security, health, or welfare, as to bring the tax within the second *Montana* exception.

### I

The Tribes argue that res judicata or, in contemporary terminology, claim preclusion, bars a challenge to their tax on BN. We recently summarized the doctrine of res judicata or claim preclusion:

> Res judicata is applicable whenever there is (1) an identity of claims, (2) a final judgment on the merits, and (3) privity between parties. Identity of claims exists when two suits arise from the same transactional nucleus of facts.

*Stratosphere Litig. L.L.C. v. Grand Casinos, Inc.,* 298 F.3d 1137, 1142 n. 3 (9th Cir.2002) (internal quotation marks and citations omitted). The Tribes assert that, applying these standards, the *Burlington I* holding survives the change in law effected by *Big Horn.*

■ We disagree. The "same transactional nucleus of facts" is not present in both *Burlington I* and this case. *Commissioner v. Sunnen,* 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898 (1948), considering res judicata principles in the tax context, established that "[e]ach year [of taxation] is the origin of a new liability and of a separate cause of action." *Id.* at 598, 68 S.Ct. 715; *see also Limbach v. Hooven & Allison Co.,* 466 U.S. 353, 362, 104 S.Ct. 1837, 80 L.Ed.2d 356 (1984) (holding in a case involving discrete tax years where "[t]he parties, the tax, and the goods imported and their containers are the same" that although "[c]ollateral-estoppel concepts ... might have an initial appeal ... [t]he reason for not applying the collateral-estoppel doctrine in the present case is even stronger than that in *Sunnen,* for here the constitutional analysis of the earlier case [was] *repudiated* by this Court's intervening pronouncement." (emphasis in the original)).

Although *Burlington I* was an action for injunctive relief rather than a retrospective challenge to taxpayer liability for particular tax years, the principles of *Sunnen* apply. As the *Sunnen* court explained:

> A taxpayer may secure a judicial determination of a particular tax matter, a matter which may recur without substantial variation for some years thereafter. But a subsequent modification of the significant facts or a change or development in the controlling legal principles may make that determination obsolete or erroneous, at least for future purposes. If such a determination is then perpetuated each succeeding year as to the taxpayer involved in the original litigation, he is accorded a tax treatment different from that given to other taxpayers of the same class. As a result, there are inequalities in the administration of the revenue laws, discriminatory distinctions in tax liability, and a fertile basis for litigious confusion.

333 U.S. at 599, 68 S.Ct. 715; *see also Carter v. United States,* 973 F.2d 1479, 1483 n. 1 (9th Cir.1992) (collateral estoppel or issue preclusion must be applied in such a manner as "to avoid endowing taxpayers

with perpetual, vested rights in a certain tax treatment, based on 'decisions that have become obsolete or erroneous with time, thereby causing inequities among taxpayers.'" (quoting *Sunnen*, 333 U.S. at 599, 68 S.Ct. 715)).

The core of *Sunnen* is the holding that tax cases by their nature raise different *claims* concerning different tax years, although the *issues* may be precisely the same. Thus, claim preclusion (res judicata) should give way to issue preclusion (collateral estoppel) where a different tax year is in question, even if the legal issues and facts are otherwise the same. The impact of this distinction on the present case flows from the principle that issue preclusion is susceptible to changed legal conditions, while claim preclusion is generally not.

The *Burlington I* litigation does not preclude BN's claim that an intervening change of law rendered the Company's future payments of taxes, distinct annual events, invalid. The *Burlington I* court could not have established BN's tax liability forever. *Burlington I*, like any other declaratory or injunctive case, was necessarily adjudicating *liability* on the basis of discrete events—in this case tax years past and present—although there was no retrospective relief at issue. As in *Limbach*, 466 U.S. at 362, 104 S.Ct. 1837,

> [f]ailure to follow *Sunnen*'s dictates would lead to the very tax inequality that the admonition of that case was designed to avoid. Hooven then would be immune forever from tax on its imported goods because of an early decision based upon a now repudiated legal

doctrine, while all other taxpayers would have their tax liabilities determined upon the basis of [a] fundamentally different approach....

The *Sunnen* line of precedents establishing that litigation concerning different tax years is subject not to claim preclusion, but rather only to issue preclusion, therefore controls the current case. Res judicata principles do not justify the Tribes' tax.[2]

## II

The Tribes argue in the alternative that the tax is justified under *Montana v. United States*, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981). *Montana* held that a tribe cannot regulate reservation land owned in fee by nonmembers of the tribe unless there is an express delegation of power from Congress or the regulation meets the criteria for one of the enunciated exceptions. Those exceptions encompass situations in which (1) the nonmembers have entered into consensual relationships with the tribe or (2) the nonmember action directly threatens the political integrity, economic security, health, or welfare of the tribe. *Id.* at 565–66, 101 S.Ct. 1245.

### A.

■ To demonstrate congressional delegation of power, express authorization is required. *Strate*, 520 U.S. at 445, 117 S.Ct. 1404; *Bugenig v. Hoopa Valley Tribe*, 266 F.3d 1201, 1216 (9th Cir.2001) (en banc). The Tribes argue that Congress, through legislation in the late 1880s, authorized their power to tax BN on its right-of-way. Neither the right-of-way grant of 1887 nor the 1888 Act establishing the Reservation's current boundaries,[3]

---

**2.** Had an injunction been issued, the court's order would, of course, have been binding according to its terms unless and until lifted by the issuing court. *See Sharp v. Weston*, 233 F.3d 1166, 1170 (9th Cir.2000) ("A party seeking modification or dissolution of an injunction bears the burden of establishing that a significant change in facts or law warrants revision or dissolution of the injunction.").

**3.** Act of May 1, 1888, ch. 213, art. VIII, 25 Stat. 113.

however, explicitly addressed the Tribes' authority to tax the congressionally-conferred right-of-way. Both therefore fail to meet the affirmative delegation requirement.

*Burlington I* did not state otherwise. Rather, *Burlington I* held only the opposite—that there was "no clear expression Congress intended the Act of 1888 to extinguish the Tribes' property interest [in what that court considered to be trust lands]." 924 F.2d at 904. *Burlington I* never ruled on whether there had been an express congressional delegation permitting taxation of the right-of-way, because that court believed that Congress would have had to take powers *away* from the Tribe to prevent taxation, rather than the reverse.

As noted in *Bugenig,* 266 F.3d at 1216, it is now clear that this type of reverse intent analysis is inadequate. Express, affirmative congressional delegation is required. No express delegation of power from Congress justifies the Tribes' tax.

## B.

■ The tax can only be permissible, consequently, if the Tribes justify it under one of the two *Montana* exceptions. The first *Montana* exception applies when "[a] tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts,

leases, or other arrangements." *Montana,* 450 U.S. at 565, 101 S.Ct. 1245; *see also Atkinson Trading Co. v. Shirley,* 532 U.S. 645, 656, 121 S.Ct. 1825, 149 L.Ed.2d 889 (2001) ("*Montana*'s consensual relationship exception requires that the tax or regulation imposed by the Indian tribe have a nexus to the consensual relationship itself.").

The nexus of the tax at issue is not limited to the "activities" of BN. *Big Horn* held that "[a]n ad valorem tax on the value of Big Horn's utility property is not a tax on the activities of a nonmember, but is instead a tax on the value of property owned by a nonmember, a tax that is not included within *Montana*'s first exception." 219 F.3d at 951. The Tribes' arguments to the contrary notwithstanding, there is no relevant distinction between the tax at issue here and the one struck down in *Big Horn.* The "unitary method" of calculating the tax, which "represents an attempt to realize a fair assessment value on property," *Western Air Lines v. Michunovich,* 149 Mont. 347, 428 P.2d 3, 5 (1967),[4] taxes the right-of-way property directly, in a manner that has no nexus to any consensual relationship between the Tribes and BN.[5]

## C.

■ *Montana*'s second exception is for "conduct of non-Indians on fee lands ... when that conduct threatens or has some direct effect on the political integrity, the

---

**4.** The "unitary method" subsumes the market value of property in a calculation of *"the value of the entire system,* as a going concern." *Western Air Lines,* 428 P.2d at 5 (emphasis added).

**5.** *Burlington I* did state that: "If a consensual relationship was necessary, the Tribes consented to railroad rights of way by joining in Article VIII of the agreement ratified by the Act of 1888 and Burlington Northern chose to

run rail lines through the reservations by voluntarily applying for rights of way." 924 F.2d at 904 n. 7. In light of further case law, however, it is now clear that this statement misreads the nature of the first *Montana* exception. *Cf. Red Wolf,* 196 F.3d at 1064 ("A right-of-way created by congressional grant is a transfer of a property interest that does not create a continuing consensual relationship between a tribe and the grantee.").

economic security, or the health or welfare of the tribe." 450 U.S. at 566, 101 S.Ct. 1245. In assessing taxation allegedly justified under the second *Montana* exception, the Supreme Court's decision in *Atkinson Trading Co.* took a narrow approach:

> *Montana*'s second exception can be misperceived. The exception is only triggered by *nonmember conduct* that threatens the Indian tribe[;] it does not broadly permit the exercise of civil authority wherever it might be considered necessary to self-government. Thus, unless the drain of the nonmember's conduct upon tribal services and resources is so severe that it actually imperils the political integrity of the Indian tribe, there can be no assertion of civil authority beyond tribal lands.

532 U.S. at 657 n. 12, 121 S.Ct. 1825 (internal quotation marks and citations omitted) (emphasis in the original); *see also Yellowstone County v. Pease*, 96 F.3d 1169, 1176–77 (9th Cir.1996) (denying a *Montana* second exception claim because of a failure to "establish a '*direct* effect on the political integrity, the economic security, or the health or welfare of *the Tribe as a whole*.'" (citation omitted) (emphasis in the original)).[6]

The Tribes argue that their Rule 56(f) motion should have been granted, allowing them discovery to buttress their *Montana* exception claims. We agree, but only as to the second *Montana* exception.

■ "Federal Rule of Civil Procedure 56(f) provides a device for litigants to avoid summary judgment when they have not had sufficient time to develop affirmative evidence." *United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1000 (9th Cir. 2002). The district court's decision on a Rule 56(f) motion is reviewed for an abuse of discretion. *Id.*

■ In this case BN brought a summary judgment motion less than a month after filing suit. Rule 56(a) permits a party asserting a claim to move for summary judgment any time after the expiration of 20 days from the commencement of the action. BN's early filing of its summary judgment motion was therefore permissible. Where, however, a summary judgment motion is filed so early in the litigation, before a party has had any realistic opportunity to pursue discovery relating to its theory of the case, district courts should grant any Rule 56(f) motion fairly freely. *See Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 846 (9th Cir.2001) ("Although Rule 56(f) facially gives judges the discretion to disallow discovery when the non-moving party cannot yet submit evidence supporting its opposition, the Supreme Court has restated the rule as requiring, rather than merely permitting, discovery 'where the non-moving party has not had the opportunity to discover information that is essential to its opposition.' ") (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n. 5, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)); *see also Berkeley v. Home Ins. Co.*, 68 F.3d 1409, 1414 (D.C.Cir.1995) (describing "the usual generous approach toward granting Rule 56(f) motions"); *Wichita Falls Office Assoc. v. Banc One Corp.*, 978 F.2d 915, 919 n. 4 (5th Cir.1992) (Rule 56(f)-based "continuance of a motion for summary judgment

---

**6.** *Atkinson Trading Co.*, 532 U.S. at 655, 121 S.Ct. 1825, suggested a fee-for-service fiscal solution to nonmember activities that produce externalities for tribes but do not rise to the level required by the second *Montana* exception. *See also Red Wolf*, 196 F.3d at 1065

("The absence of tribal jurisdiction does not leave the Tribe or its members without redress for nonmembers' alleged wrongs. Tribal plaintiffs may find a forum in either state or federal courts, as appropriate.").

for purposes of discovery should be granted almost as a matter of course unless the non-moving party has not diligently pursued discovery of the evidence" (internal quotation marks and citation omitted)); *Sames v. Gable*, 732 F.2d 49, 52 (3d Cir. 1984) (same).

Especially where, as here, documentation or witness testimony may exist that is dispositive of a pivotal question—namely, the extent of danger posed by BN shipments—lightning-quick summary judgment motions can impede informed resolution of fact-specific disputes. Further, where, as in the present litigation, no discovery whatsoever has taken place, the party making a Rule 56(f) motion cannot be expected to frame its motion with great specificity as to the kind of discovery likely to turn up useful information, as the ground for such specificity has not yet been laid.

■ Applying these standards, we conclude that the district court did not abuse its discretion by denying the Rule 56(f) motion with respect to the first *Montana* exception. Any such discovery would be futile. As stated above, the "unitary method" presently used by the Tribes to assess their ad valorem tax is based on the value of BN's property and thus bears no demonstrable nexus to the consensual relationships alleged by the Tribes.

We conclude otherwise, however, with regard to the second *Montana* exception. While the Tribes are already in a fine position to know with whom they have contractual relations, they are not similarly situated with respect to the possible hazards created by BN's use of its right-of-way. The Tribes cannot show that there is a genuine issue of material fact concerning whether their political integrity, economic security, health, or welfare is directly threatened in a serious and substantial manner if they are not permitted some discovery on the nature of the threat facing them prior to the summary judgment determination. *Cf. Montana v. United States EPA*, 137 F.3d 1135, 1141 (9th Cir.1998) (in which we recognized that there is a spectrum of harms to consider when applying *Montana*'s second exception: "the conduct of users of a small stretch of highway [as in *Strate*] has no potential to affect the health and welfare of a tribe in any way approaching the threat inherent in impairment of the quality of the principal water source.").

We note, in particular, that in the year 2000, more than 1,695 freight cars crossed the Reservation each day. The Tribes are aware that hazardous materials are carried on BN's cars because BN has asked the Tribes to work with the Company on emergency contingency plans. The Tribes know of derailment incidents and, in their own words, "have gathered evidence of numerous fires and accidents with attendant property damage and sometimes fatalities ... but discovery of Burlington's own files [is] necessary for a complete record on application of *Montana*'s second exception."

■ Because the Tribes have shown some basis for believing that BN's use of its right-of-way threatens serious harm to the Reservation and also had no fair opportunity to develop the record concerning the extent of that threatened harm, it was an abuse of discretion for the district court to decide the summary judgment motion before granting the Tribes' Rule 56(f) motion. *See VISA Int'l Serv. Ass'n v. Bankcard Holders of Am.*, 784 F.2d 1472, 1475 (9th Cir.1986) ("[T]he denial of a Rule 56(f) application is generally disfavored where the party opposing summary judgment makes (a) a timely application which (b) specifically identifies (c) relevant information, (d) where there is some basis for believing that the information sought actu-

ally exists. Summary denial is especially inappropriate where [as in the Tribes' case] the material sought is also the subject of outstanding discovery requests."); *see also Glen Eden Hosp., Inc. v. Blue Cross & Blue Shield, Inc.,* 740 F.2d 423, 427 (6th Cir.1984) (finding an abuse of discretion where "the district court gave no reason for declining to permit further discovery before ruling on the motion for summary judgment," when counsel's affidavit satisfied the requirements of Rule 56(f), referred to attempted discovery of facts solely within the possession or knowledge of the defendant, sought information that was identified with specificity, not cumulative, and directly related to plaintiff's theory.).

These principles have particular application in the present context. *Montana* set a critical boundary line between the sovereignty of Indian nations and the non-Indian populace that lives, works or interacts with tribes on their territory. Our law governing the scope of the second *Montana* exception, now two decades old, is still in its infancy. Its sound development is vital if there are to be harmonious and stable relations between tribes and non-Indian interlocutors. We conclude in the context of this litigation that a more complete record is necessary to the resolution of the dispute at issue. The Tribes are entitled to some discovery, as framed by the district court, on the second *Montana* exception.

Under Rule 56(f) the district court may "permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just." Fed.R.Civ.P. 56(f). Our decision that summary judgment was premature in light of the Rule 56(f) motion does not require that the district court permit wholesale discovery. Rather, the district court may tailor limited discovery before again entertaining a motion for summary judgment. *See, e.g., Sundstrom v. McDonnell Douglas Corp.,* 816 F.Supp. 577, 586 (N.D.Cal.1992) (directing and limiting discovery after granting Rule 56(f) motion). Discovery should proceed in accordance with the district court's guidance and oversight, with violations sanctionable under Fed.R.Civ.P. 37.

## III

In ordering discovery to proceed, we make no judgment as to the validity of the Tribes' claim that their tax falls within *Montana*'s second exception. The record as it stands therefore provides inadequate information as to whether exhaustion of tribal court remedies would be futile. *See Nevada v. Hicks,* 533 U.S. 353, 369, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001) (noting *Strate's* exhaustion exception for cases in which " 'it is plain that no federal grant provides for tribal governance of nonmembers' conduct on land covered by *Montana*'s main rule,' so the exhaustion requirement 'would serve no purpose other than delay.' "). After some discovery is concluded, the district court may well be presented with a fresh summary judgment motion concerning the second *Montana* exception. At that stage, the district court should explicitly address any exhaustion argument made by the Tribes in opposition to a summary judgment motion. We do not decide the tribal court exhaustion issue now.

## IV

We conclude that under the case law as it has developed since *Burlington I*, the district court's grant of summary judgment was largely correct. The Tribes should, however, be permitted some discovery regarding the second *Montana* exception. We therefore VACATE the

summary judgment and REMAND for proceedings consistent with this opinion.

Each party to bear its own costs.

GOULD, Circuit Judge, concurring.

I concur and comment on the *Montana* exceptions. Since *Montana* was declared the law of the land by the Supreme Court in 1981, Indian nations, non-Indians who live or do business on Indian lands, and others who interact with Indian nations have struggled to define the bounds for the consent and tribal integrity exceptions to *Montana*'s general rule restricting Indian nations' jurisdiction over non-Indians. We are not dealing with a frivolous position by the tribes, but with the line between Indian sovereignty and freedom of action of those whose lives cross Indian territory. I agree with our ruling on discovery on the second *Montana* exception, for if the trains crossing a tribe's reservation carry toxic or dangerous chemicals, nuclear waste, biological dangers, or other threats to the reservation, then the tribe has a right to know what company it keeps, and then to assess whether any taxing strategy could fairly cover the tribe's protective costs. Only on a full record can it fairly be decided whether *Montana*'s second exception can be satisfied.