# ATKINSON TRADING CO., INC. *v.* SHIRLEY ET AL.

No. 00–454.   Argued March 27, 2001—Decided May 29, 2001

*Charles G. Cole* argued the cause for petitioner. With him on the briefs were *Shannen W. Coffin* and *William J. Darling.*

*Marcelino R. Gomez* argued the cause and filed a brief for respondents.

*Beth S. Brinkmann* argued the cause for the United States as *amicus curiae* urging affirmance. On the brief were *Acting Solicitor General Underwood, Acting Assistant*

*Attorney General Cruden, Deputy Solicitor General Kneedler, Edward C. DuMont, E. Ann Peterson, and William B. Lazarus.** 

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

In *Montana* v. *United States*, 450 U. S. 544 (1981), we held that, with limited exceptions, Indian tribes lack civil authority over the conduct of nonmembers on non-Indian fee land within a reservation. The question with which we are presented is whether this general rule applies to tribal attempts to tax nonmember activity occurring on non-Indian fee land. We hold that it does and that neither of *Montana*'s exceptions obtains here.

In 1916, Hubert Richardson, lured by the possibility of trading with wealthy Gray Mountain Navajo cattlemen, built the Cameron Trading Post just south of the Little Colorado River near Cameron, Arizona. G. Richardson, Navajo Trader 136–137 (1986). Richardson purchased the land

---

*Briefs of *amici curiae* urging reversal were filed for the State of South Dakota et al. by *Mark W. Barnett*, Attorney General of South Dakota, and *John Patrick Guhin*, Deputy Attorney General, and by the Attorneys General for their respective States as follows: *Bill Pryor* of Alabama, *Ken Salazar* of Colorado, *Robert A. Butterworth* of Florida, *Jennifer M. Granholm* of Michigan, *Mike Moore* of Mississippi, *Wayne Stenehjem* of North Dakota, *W. A. Drew Edmondson* of Oklahoma, and *Jan Graham* of Utah; for the Association of American Railroads by *Lynn H. Slade*, *Walter E. Stern*, and *William C. Scott*; for the Interstate Natural Gas Association of America by *Michael E. Webster* and *Neil G. Westesen*; for Proper Economic Resource Management, Inc., by *Randy V. Thompson*; and for Roberta Bugenig et al. by *James S. Burling*.

Briefs of *amici curiae* urging affirmance were filed for the Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation et al. by *William R. Perry* and *Arthur Lazarus, Jr.*; for the Colorado River Indian Tribes et al. by *Susan M. Williams*; for the Confederated Tribes of the Umatilla Indian Reservation et al. by *Michael L. Roy* and *Jeffrey D. Lerner*; and for the Shakopee Mdewakanton Sioux (Dakota) Community et al. by *Andrew M. Small* and *Steven F. Olson*.

directly from the United States, but the Navajo Nation Reservation, which had been established in 1868, see 15 Stat. 667, was later extended eight miles south so that the Cameron Trading Post fell within its exterior boundaries. See Act of June 14, 1934, ch. 521, 48 Stat. 960–962. This 1934 enlargement of the Navajo Reservation—which today stretches across northeast Arizona, northwest New Mexico, and southeast Utah—did not alter the status of the property: It is, like millions of acres throughout the United States, non-Indian fee land within a tribal reservation.

Richardson's "drafty, wooden store building and four small, one-room-shack cabins overlooking the bare river canyon," Richardson, *supra*, at 135, have since evolved into a business complex consisting of a hotel, restaurant, cafeteria, gallery, curio shop, retail store, and recreational vehicle facility. The current owner, petitioner Atkinson Trading Company, Inc., benefits from the Cameron Trading Post's location near the intersection of Arizona Highway 64 (which leads west to the Grand Canyon) and United States Highway 89 (which connects Flagstaff on the south with Glen Canyon Dam to the north). A significant portion of petitioner's hotel business stems from tourists on their way to or from the Grand Canyon National Park.

In 1992, the Navajo Nation enacted a hotel occupancy tax, which imposes an 8 percent tax upon any hotel room located within the exterior boundaries of the Navajo Nation Reservation. See 24 Navajo Nation Code §§ 101–142 (1995), App. to Pet. for Cert. 102a–124a. Although the legal incidence of the tax falls directly upon the guests, the owner or operator of the hotel must collect and remit it to respondents, members of the Navajo Tax Commission. §§ 104, 107. The nonmember guests at the Cameron Trading Post pay approximately $84,000 in taxes to respondents annually.

Petitioner's challenge under *Montana* to the Navajo Nation's authority to impose the hotel occupancy tax was rejected by both the Navajo Tax Commission and the Navajo

Supreme Court. Petitioner then sought relief in the United States District Court for the District of New Mexico, which also upheld the tax. A divided panel of the Court of Appeals for the Tenth Circuit affirmed. See 210 F. 3d 1247 (2000).

Although the Court of Appeals agreed with petitioner that our cases in this area "did make an issue of the fee status of the land in question," *id.*, at 1256, it nonetheless concluded that the status of the land as "fee land or tribal land is simply one of the factors a court should consider" when determining whether civil jurisdiction exists, *id.*, at 1258 (citing 18 U. S. C. § 1151). Relying in part upon our decision in *Merrion* v. *Jicarilla Apache Tribe*, 455 U. S. 130 (1982), the court "complement[ed]" *Montana*'s framework with a "case-by-case approach" that balanced the non-Indian fee status of the land with "the nature of the inherent sovereign powers the tribe is attempting to exercise, its interests, and the impact that the exercise of the tribe's powers has upon the nonmember interests involved." 210 F. 3d, at 1255, 1257, 1261. The Court of Appeals then likened the Navajo hotel occupancy tax to similar taxes imposed by New Mexico and Arizona, concluding that the tax fell under *Montana*'s first exception because a "consensual relationship exists in that the nonmember guests could refrain from the privilege of lodging within the confines of the Navajo Reservation and therefore remain free from liability for the [tax]." 210 F. 3d, at 1263 (citing *Buster* v. *Wright*, 135 F. 947, 949 (CA8 1905)). The dissenting judge would have applied *Montana* without "any language or 'factors' derived from *Merrion*" and concluded that, based upon her view of the record, none of the *Montana* exceptions applied. 210 F. 3d, at 1269 (Briscoe, J., dissenting).

We granted certiorari, 531 U. S. 1009 (2000), and now reverse.

Tribal jurisdiction is limited: For powers not expressly conferred upon them by federal statute or treaty, Indian tribes

must rely upon their retained or inherent sovereignty. In *Montana*, the most exhaustively reasoned of our modern cases addressing this latter authority, we observed that Indian tribe power over nonmembers on non-Indian fee land is sharply circumscribed. At issue in *Montana* was the Crow Tribe's attempt to regulate nonmember fishing and hunting on non-Indian fee land within the reservation. Although we "readily agree[d]" that the 1868 Fort Laramie Treaty authorized the Crow Tribe to prohibit nonmembers from hunting or fishing on tribal land, 450 U. S., at 557, we held that such "power cannot apply to lands held in fee by non-Indians." *Id.*, at 559. This delineation of members and nonmembers, tribal land and non-Indian fee land, stemmed from the dependent nature of tribal sovereignty. Surveying our cases in this area dating back to 1810, see *Fletcher* v. *Peck*, 6 Cranch 87, 147 (1810) (Johnson, J., concurring) (stating that Indian tribes have lost any "right of governing every person within their limits except themselves"), we noted that "through their original incorporation into the United States as well as through specific treaties and statutes, Indian tribes have lost many of the attributes of sovereignty." 450 U. S., at 563.[1] We concluded that the inherent sovereignty of Indian tribes was limited to "their members and their territory": "[E]xercise of tribal power beyond what is necessary to protect tribal self-government or to control internal rela-

---

[1] We also noted that nearly 90 million acres of non-Indian fee land had been acquired as part of the Indian General Allotment Act, 24 Stat. 388, as amended, 25 U. S. C. §331 *et seq.*, which authorized the issuance of patents in fee to individual Indian allottees who, after holding the patent for 25 years, could then transfer the land to non-Indians. Although Congress repudiated the practice of allotment in the Indian Reorganization Act, 48 Stat. 984, 25 U. S. C. §461 *et seq.*, we nonetheless found significant that Congress equated alienation "with the dissolution of tribal affairs and jurisdiction." *Montana*, 450 U. S., at 559, n. 9. We thus concluded that it "defie[d] common sense to suppose that Congress would intend that non-Indians purchasing allotted lands would become subject to tribal jurisdiction." *Ibid.*

tions is inconsistent with the dependent status of the tribes." *Id.*, at 564 (citing *United States* v. *Wheeler,* 435 U. S. 313, 326 (1978) ("[T]he dependent status of Indian tribes . . . is necessarily inconsistent with their freedom to determine their external relations" (emphasis deleted))).

Although we extracted from our precedents "the general proposition that the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe," 450 U. S., at 565, we nonetheless noted in *Montana* two possible bases for tribal jurisdiction over non-Indian fee land. First, "[a] tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealings, contracts, leases, or other arrangements." *Ibid.* Second, "[a] tribe may . . . exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Id.*, at 566. Applying these precepts, we found that the nonmembers at issue there had not subjected themselves to "tribal civil jurisdiction" through any agreements or dealings with the Tribe and that hunting and fishing on non-Indian fee land did not "imperil the subsistence or welfare of the Tribe." *Ibid.* We therefore held that the Crow Tribe's regulations could not be enforced.

The framework set forth in *Montana* "broadly addressed the concept of 'inherent sovereignty.'" *Strate* v. *A–1 Contractors*, 520 U. S. 438, 453 (1997) (quoting *Montana, supra,* at 563). In *Strate,* we dealt with the Three Affiliated Tribes' assertion of judicial jurisdiction over an automobile accident involving two nonmembers traveling on a state highway within the reservation. Although we did not question the ability of tribal police to patrol the highway, see 520 U. S., at 456, n. 11, we likened the public right-of-way to non-Indian fee land because the Tribes lacked the power to

"assert a landowner's right to occupy and exclude," *id.,* at 456. Recognizing that *Montana* "immediately involved regulatory authority,"[2] we nonetheless concluded that its reasoning had "delineated—in a main rule and exceptions—the bounds of the power tribes retain to exercise 'forms of civil jurisdiction over non-Indians.'" 520 U. S., at 453 (quoting *Montana, supra,* at 565). We accordingly held that *Montana* governed tribal assertions of adjudicatory authority over non-Indian fee land within a reservation. See 520 U. S., at 453 ("Subject to controlling provisions in treaties and statutes, and the two exceptions identified in *Montana,* the *civil authority* of Indian tribes and their courts with respect to non-Indian fee lands generally 'do[es] not extend to the activities of nonmembers of the tribe'" (emphasis added) (quoting *Montana, supra,* at 565)).

Citing our decision in *Merrion,* respondents submit that *Montana* and *Strate* do not restrict an Indian tribe's power to impose revenue-raising taxes.[3] In *Merrion,* just one year after our decision in *Montana,* we upheld a severance tax imposed by the Jicarilla Apache Tribe upon non-Indian lessees authorized to extract oil and gas from tribal land. In so doing, we noted that the power to tax derives not solely from an Indian tribe's power to exclude non-Indians from tribal land, but also from an Indian tribe's "general authority, as sovereign, to control economic activity within its jurisdiction." 455 U. S., at 137. Such authority, we held, was incident to the benefits conferred upon nonmembers: "They benefit from the provision of police protection and other governmental services, as well as from '"the advantages of a civilized society"' that are assured by the existence of tribal

---

[2] See also *South Dakota* v. *Bourland,* 508 U. S. 679 (1993); *Brendale* v. *Confederated Tribes and Bands of Yakima Nation,* 492 U. S. 408 (1989).

[3] Respondents concede that regulatory taxes fall under the *Montana* framework. See 450 U. S., at 565 ("A tribe may regulate, through taxation, . . . the activities of nonmembers").

government." *Id.*, at 137–138 (quoting *Exxon Corp.* v. *Department of Revenue of Wis.*, 447 U. S. 207, 228 (1980)).

*Merrion*, however, was careful to note that an Indian tribe's inherent power to tax only extended to "'transactions occurring on *trust lands* and significantly involving a tribe or its members.'" 455 U. S., at 137 (emphasis added) (quoting *Washington* v. *Confederated Tribes of Colville Reservation*, 447 U. S. 134, 152 (1980)). There are undoubtedly parts of the *Merrion* opinion that suggest a broader scope for tribal taxing authority than the quoted language above.[4] But *Merrion* involved a tax that only applied to activity occurring on the reservation, and its holding is therefore easily reconcilable with the *Montana-Strate* line of authority, which we deem to be controlling. See *Merrion*, *supra*, at 142 ("[A] tribe has no authority over a nonmember until the nonmember enters tribal lands or conducts business with the tribe"). An Indian tribe's sovereign power to tax—whatever its derivation—reaches no further than tribal land.[5]

---

[4] *Merrion* v. *Jicarilla Apache Tribe*, 455 U. S. 130 (1982), for example, referenced the decision of the Court of Appeals for the Eighth Circuit in *Buster* v. *Wright*, 135 F. 947 (1905). But we have never endorsed *Buster*'s statement that an Indian tribe's "jurisdiction to govern the inhabitants of a country is not conditioned or limited by the title to the land which they occupy in it." *Id.*, at 951. Accordingly, beyond any guidance it might provide as to the type of consensual relationship contemplated by the first exception of *Montana* v. *United States*, 450 U. S. 544, 566 (1981), *Buster* is not an authoritative precedent.

[5] We find misplaced the Court of Appeals' reliance upon 18 U. S. C. § 1151, a statute conferring upon Indian tribes jurisdiction over certain criminal acts occurring in "Indian country," or "all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation." See also *Duro* v. *Reina*, 495 U. S. 676, 680, n. 1 (1990). Although § 1151 has been relied upon to demarcate state, federal, and tribal jurisdiction over criminal and civil matters, see *DeCoteau* v. *District County Court for Tenth Judicial Dist.*, 420 U. S. 425, 427, n. 2 (1975) ("While § 1151 is concerned, on its face, only

We therefore do not read *Merrion* to exempt taxation from *Montana*'s general rule that Indian tribes lack civil authority over nonmembers on non-Indian fee land. Accordingly, as in *Strate*, we apply *Montana* straight up. Because Congress has not authorized the Navajo Nation's hotel occupancy tax through treaty or statute, and because the incidence of the tax falls upon nonmembers on non-Indian fee land, it is incumbent upon the Navajo Nation to establish the existence of one of *Montana*'s exceptions.

Respondents argue that both petitioner and its hotel guests have entered into a consensual relationship with the Navajo Nation justifying the imposition of the hotel occupancy tax.[6] Echoing the reasoning of the Court of Appeals, respondents note that the Cameron Trading Post benefits from the numerous services provided by the Navajo Nation. The record reflects that the Arizona State Police and the Navajo Tribal Police patrol the portions of United States

_____

with criminal jurisdiction, the Court has recognized that it generally applies as well to questions of civil jurisdiction [citing cases]"), we do not here deal with a claim of statutorily conferred power. Section 1151 simply does not address an Indian tribe's inherent or retained sovereignty over nonmembers on non-Indian fee land.

At least in the context of non-Indian fee land, we also find inapt the Court of Appeals' analogy to state taxing authority. Our reference in *Merrion* to a State's ability to tax activities with which it has a substantial nexus was made in the context of describing an Indian tribe's authority over *tribal land*. See 455 U. S., at 137–138 (citing *Exxon Corp.* v. *Department of Revenue of Wis.*, 447 U. S. 207, 228 (1980); *Japan Line, Ltd.* v. *County of Los Angeles*, 441 U. S. 434, 445 (1979)). Only full territorial sovereigns enjoy the "power to enforce laws against all who come within the sovereign's territory, whether citizens or aliens," and Indian tribes "can no longer be described as sovereigns in this sense." *Duro* v. *Reina, supra*, at 685.

[6] Because the legal incidence of the tax falls directly upon the guests, not petitioner, it is unclear whether the Tribe's relationship with petitioner is at all relevant. We need not, however, decide this issue since the hotel occupancy tax exceeds the Tribe's authority even considering petitioner's contacts with the Navajo Nation.

Highway 89 and Arizona Highway 64 traversing the reservation; that the Navajo Tribal Police and the Navajo Tribal Emergency Medical Services Department will respond to an emergency call from the Cameron Trading Post; and that local Arizona Fire Departments and the Navajo Tribal Fire Department provide fire protection to the area.[7]   Although we do not question the Navajo Nation's ability to charge an appropriate fee for a particular service actually rendered,[8] we think the generalized availability of tribal services patently insufficient to sustain the Tribe's civil authority over nonmembers on non-Indian fee land.

The consensual relationship must stem from "commercial dealing, contracts, leases, or other arrangements," *Montana*, 450 U. S., at 565, and a nonmember's actual or potential receipt of tribal police, fire, and medical services does not create the requisite connection.   If it did, the exception would swallow the rule: All non-Indian fee lands within a reservation benefit, to some extent, from the "advantages of a civilized society" offered by the Indian tribe.   *Merrion, supra,* at 137–138 (internal quotation marks and citation omitted). Such a result does not square with our precedents; indeed, we implicitly rejected this argument in *Strate*,[9] where we held that the nonmembers had not consented to the Tribes' adjudicatory authority by availing themselves of the benefit of tribal police protection while traveling within the reservation.   See 520 U. S., at 456–457, and n. 11.   We therefore reject respondents' broad reading of *Montana*'s first exception, which ignores the dependent status of Indian tribes and subverts the territorial restriction upon tribal power.

---

[7] The Navajo Tribal Fire Department has responded to a fire at the Cameron Trading Post.   See App. to Pet. for Cert. 57a.

[8] The Navajo Nation charges for its emergency medical services (a flat call-out fee of $300 and a mileage fee of $6.25 per mile).   See App. 127–129.

[9] See Reply Brief for Petitioners 13–14 and Brief for United States as *Amicus Curiae* 29 in *Strate* v. *A–1 Contractors,* O. T. 1996, No. 95–1872.

Respondents and their principal *amicus*, the United States, also argue that petitioner consented to the tax by becoming an "Indian trader." Congress has authorized the Commissioner of Indian Affairs "to appoint traders to the Indian tribes and to make such rules and regulations as he may deem just and proper specifying the kind and quantity of goods and the prices at which such goods shall be sold to the Indians." 25 U. S. C. § 261. Petitioner has acquired the requisite license to transact business with the Navajo Nation and therefore is subject to the regulatory strictures promulgated by the Indian Affairs Commissioner. See 25 CFR pt. 141 (2000).[10] But whether or not the Navajo Nation could impose a tax on activities arising out of this relationship, an issue not before us, it is clear that petitioner's "Indian trader" status by itself cannot support the imposition of the hotel occupancy tax.

*Montana*'s consensual relationship exception requires that the tax or regulation imposed by the Indian tribe have a nexus to the consensual relationship itself. In *Strate*, for example, even though respondent A–1 Contractors was on the reservation to perform landscaping work for the Three Affiliated Tribes at the time of the accident, we nonetheless held that the Tribes lacked adjudicatory authority because the other nonmember "was not a party to the subcontract, and the [T]ribes were strangers to the accident." 520 U. S., at 457 (internal quotation marks and citation omitted). A nonmember's consensual relationship in one area thus does not trigger tribal civil authority in another—it is not "in for a penny, in for a Pound." E. Ravenscroft, The Canterbury Guests; Or A Bargain Broken, act v, sc. 1. The hotel occupancy tax at issue here is grounded in petitioner's relationship with its nonmember hotel guests, who can reach the Cameron Trading Post on United States Highway 89 and

---

[10] Although the regulations do not "preclude" the Navajo Nation from imposing upon "Indian traders" such "fees or taxes [it] may deem appropriate," the regulations do not contemplate or authorize the hotel occupancy tax at issue here. 25 CFR § 141.11 (2000).

Arizona Highway 64, non-Indian public rights-of-way. Petitioner cannot be said to have consented to such a tax by virtue of its status as an "Indian trader."

Although the Court of Appeals did not reach *Montana's* second exception, both respondents and the United States argue that the hotel occupancy tax is warranted in light of the direct effects the Cameron Trading Post has upon the Navajo Nation. Again noting the Navajo Nation's provision of tribal services and petitioner's status as an "Indian trader," respondents emphasize that petitioner employs almost 100 Navajo Indians; that the Cameron Trading Post derives business from tourists visiting the reservation; and that large amounts of tribal land surround petitioner's isolated property.[11] Although we have no cause to doubt respondents' assertion that the Cameron Chapter of the Navajo Nation possesses an "overwhelming Indian character," Brief for Respondents 13–14, we fail to see how petitioner's operation of a hotel on non-Indian fee land "threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Montana, supra,* at 566.[12]

---

[11] The record does not reflect the amount of non-Indian fee land within the Navajo Nation. A 1995 study commissioned by the United States Department of Commerce states that 96.3 percent of the Navajo Nation's 16,224,896 acres is tribally owned, with allotted land comprising 762,749 acres, or 4.7 percent, of the reservation. See Economic Development Administration, V. Tiller, American Indian Reservations and Indian Trust Areas 214 (1995). The 1990 Census reports that that 96.6 percent of residents on the Navajo Nation are Indian. Joint Lodging 182. The Cameron Chapter of the Navajo Nation, in which petitioner's land lies, has a non-Indian population of 2.3 percent. See *id.,* at 181.

[12] Although language in *Merrion* referred to taxation as "necessary to tribal self-government and territorial management," 455 U. S., at 141, it did not address assertions of tribal jurisdiction over non-Indian fee land. Just as with *Montana's* first exception, incorporating *Merrion's* reasoning here would be tantamount to rejecting *Montana's* general rule. In *Strate* v. *A–1 Contractors,* 520 U. S. 438, 459 (1997), we stated that *Montana's* second exception "can be misperceived." The exception is only triggered by *nonmember conduct* that threatens the Indian tribe; it does not broadly

We find unpersuasive respondents' attempt to augment this claim by reference to *Brendale* v. *Confederated Tribes and Bands of Yakima Nation*, 492 U. S. 408, 440 (1989) (opinion of STEVENS, J.). In this portion of *Brendale*, per the reasoning of two Justices, we held that the Yakima Nation had the authority to zone a small, non-Indian parcel located "in the heart" of over 800,000 acres of closed and largely uninhabited tribal land. *Ibid.* Respondents extrapolate from this holding that Indian tribes enjoy broad authority over nonmembers wherever the acreage of non-Indian fee land is minuscule in relation to the surrounding tribal land. But we think it plain that the judgment in *Brendale* turned on both the closed nature of the non-Indian fee land[13] and the fact that its development would place the entire area "in jeopardy." *Id.*, at 443 (internal quotation marks and citation omitted).[14] Irrespective of the percentage of non-Indian fee land within a reservation, *Montana*'s second exception grants Indian tribes nothing "'beyond what is necessary to·

permit the exercise of civil authority wherever it might be considered "necessary" to self-government. Thus, unless the drain of the nonmember's conduct upon tribal services and resources is so severe that it actually "imperil[s]" the political integrity of the Indian tribe, there can be no assertion of civil authority beyond tribal lands. *Montana*, 450 U. S., at 566. Petitioner's hotel has no such adverse effect upon the Navajo Nation.

[13] JUSTICE STEVENS' opinion in *Brendale* sets out in some detail the restrictive nature of "closed area" surrounding the non-Indian fee land. See 492 U. S., at 438–441. Pursuant to the powers reserved it in an 1855 treaty with the United States, the Yakima Nation closed this forested area to the public and severely limited the activities of those who entered the land through a "courtesy permit system." *Id.*, at 439 (internal quotation marks and citation omitted). The record here establishes that, save a few natural areas and parks not at issue, the Navajo Reservation is open to the general public. App. 61.

[14] See *Strate* v. *A-1 Contractors, supra*, at 447, n. 6 (noting that the Yakima Nation "retained zoning authority . . . only in the closed area"); *Duro* v. *Reina*, 495 U. S., at 688 (noting that zoning "is vital to the maintenance of tribal integrity and self-determination").

protect tribal self-government or to control internal relations.'" *Strate*, 520 U. S., at 459 (quoting *Montana*, 450 U. S., at 564). Whatever effect petitioner's operation of the Cameron Trading Post might have upon surrounding Navajo land, it does not endanger the Navajo Nation's political integrity. See *Brendale, supra*, at 431 (opinion of White, J.) (holding that the impact of the nonmember's conduct "must be demonstrably serious and must imperil the political integrity, the economic security, or the health and welfare of the tribe").

Indian tribes are "unique aggregations possessing attributes of sovereignty over both their members and their territory," but their dependent status generally precludes extension of tribal civil authority beyond these limits. *United States* v. *Mazurie*, 419 U. S. 544, 557 (1975). The Navajo Nation's imposition of a tax upon nonmembers on non-Indian fee land within the reservation is, therefore, presumptively invalid. Because respondents have failed to establish that the hotel occupancy tax is commensurately related to any consensual relationship with petitioner or is necessary to vindicate the Navajo Nation's political integrity, the presumption ripens into a holding. The judgment of the Court of Appeals for the Tenth Circuit is accordingly

*Reversed.*

JUSTICE SOUTER, with whom JUSTICE KENNEDY and JUSTICE THOMAS join, concurring.

If we are to see coherence in the various manifestations of the general law of tribal jurisdiction over non-Indians, the source of doctrine must be *Montana* v. *United States*, 450 U. S. 544 (1981), and it is in light of that case that I join the Court's opinion. Under *Montana*, the status of territory within a reservation's boundaries as tribal or fee land may have much to do (as it does here) with the likelihood (or not) that facts will exist that are relevant under the exceptions to *Montana*'s "general proposition" that "the inherent sover-

eign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." *Id.*, at 565. That general proposition is, however, the first principle, regardless of whether the land at issue is fee land, or land owned by or held in trust for an Indian tribe.