No. 00-358

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2002 MT 140

FLAT CENTER FARMS, INC.,

      Petitioner and Respondent,

v.

STATE OF MONTANA, DEPARTMENT OF REVENUE,

      Respondent and Appellant.

FILED

JUN 2 1 2002

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:    District Court of the Fifteenth Judicial District,
                    In and for the County of Roosevelt,
                    The Honorable David Cybulski, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Chris Tweeten (argued), Assistant Attorney General, Helena, Montana

        Roberta Cross Guns, Special Assistant Attorney General, Helena, Montana

        Charlena Toro, Special Assistant Attorney General, Helena, Montana

    For Respondent:

        Laura Christoffersen (argued), Christoffersen & Knierim, P.C., Culbertson, Montana

        Ryan Rusche (argued), Christoffersen & Knierim, P.C., Culbertson, Montana

    For Amicus Curiae:

        Maylinn Smith, Attorney at Law, University of Montana School of Law, Missoula, Montana (for The Assiniboine and Sioux Tribes)

                          Argued: June 5, 2001
                       Submitted: June 5, 2001
                       Decided: June 21, 2002

Filed:

                              Clerk

Justice Terry N. Trieweiler delivered the Opinion of the Court.

¶1 The Petitioner, Flat Center Farms, Inc., appealed the Respondent Department of Revenue's imposition of the Corporation License Tax to the State Tax Appeal Board. The State Tax Appeal Board upheld the Department of Revenue's assessment. Flat Center appealed to the District Court for the Fifteenth Judicial District in Roosevelt County. The District Court reversed the decision of the State Tax Appeal Board and held that the Corporation License Tax did not apply to Flat Center. The Department of Revenue now appeals from the order of the District Court. We affirm the order of the District Court.

¶2 The sole issue presented on appeal is whether the District Court erred when it concluded that the Montana Corporation License Tax may not be imposed on an Indian-owned corporation which does business entirely within the exterior boundaries of the Fort Peck Reservation.

## FACTUAL BACKGROUND

¶3 The relevant facts to this dispute were agreed upon by the parties. Flat Center Farms, Inc. was incorporated pursuant to the laws of Montana on December 3, 1993, and chartered by the Fort Peck Tribes as a Tribal Corporation on October 7, 1996. Flat Center's sole business activity is farming and the farming operation is located entirely within the exterior boundaries of the Fort Peck Reservation.

¶4 Kim Murray is an enrolled member of the Fort Peck Tribes. He and his wife, Denise Murray, each own 200 shares of Flat Center stock. There is no non-Indian ownership of the corporation. Denise Murray is an enrolled member of the Turtle Mountain Chippewa, a tribe

2

that has allotted lands within the Fort Peck Reservation and whose members receive social services offered by the Fort Peck Reservation.

¶5 Flat Center leases all the land it farms. Some of this land is owned in fee simple by individual Indians; the remainder is held in trust by the federal government for Mr. Murray, the Tribes, or individual Indians. All of the leased lands are within the Fort Peck Reservation boundaries.

¶6 On July 12, 1996, the Department of Revenue assessed Flat Center for taxes owed pursuant to the corporation license tax for the tax year ending October 31, 1994. The corporation license tax provides that every corporation engaged in business in the State of Montana pay an annual license fee "for the privilege of carrying on business in this state." § 15-31-101(3), MCA. The tax is assessed based on a percentage a corporation's total net income during the tax year. Flat Center appealed imposition of the tax to the Division Administrator on August 8, 1996. After the Director of the Department of Revenue upheld the Division Administrator's assessment of the corporation license tax, Flat Center petitioned to the State Tax Appeal Board (STAB). STAB also upheld the Department's assessment.

¶7 Flat Center appealed STAB's decision to the District Court for the Fifteenth Judicial District in Roosevelt County. The District Court reversed STAB and the Department and granted Flat Center's motion for summary judgment. The District Court held that 1) the beneficiaries of the income were ultimately Indian persons; 2) the situs of the activity generating the income was wholly within the reservation; and 3) the assets generating the income were Indian trust lands. The District Court further held that the corporate license tax

3

impermissibly taxed lands held in trust for the Tribes and individual Indians. The Department now appeals from the order of the District Court.

## STANDARD OF REVIEW

¶8     Our standard of review of appeals from summary judgment is *de novo*. *Motarie v. Northern Montana Joint Refuse Disposal Dist.* (1995), 274 Mont. 239, 242, 907 P.2d 154, 156. We apply the same criteria which is applied by the district court pursuant to Rule 56(c), M.R.Civ.P. *Spinler v. Allen*, 1999 MT 160, ¶ 14, 295 Mont. 139, ¶ 14, 983 P.2d 348, ¶ 14. The moving party must establish both the absence of genuine issues of material fact and entitlement to judgment as a matter of law. *Hadford v. Credit Bureau of Havre, Inc.*, 1998 MT 179, ¶ 14, 289 Mont. 529, ¶ 14, 962 P.2d 1198, ¶ 14. Once the moving party has met its burden, the opposing party must present material and substantial evidence, rather than mere conclusory or speculative statements, to raise a genuine issue of material fact. *Hadford*, ¶ 14.

## DISCUSSION

¶9     Did the District Court err when it concluded that the corporation license tax may not be imposed on an Indian-owned corporation which does business entirely within the Fort Peck Reservation?

¶10    The heart of the State's argument is that there is a distinction between individual Indians and corporations. The State contends that because corporations are created by state law, they are not the legal equivalent of a tribal member and therefore Flat Center is not an "Indian" for purposes of Montana's tax code. Consequently, the income against which the license tax is assessed is not the individual income of an Indian, but rather corporate income

4

subject to Montana's state tax laws like any other corporation doing business in Montana.

¶11    The longstanding rule is that a state is without power to tax reservation lands and Indian income generated from on-reservation activities absent the express authorization of Congress. *Mescalero Apache Tribe v. Jones* (1973), 411 U.S. 145, 148, 93 S.Ct. 1267, 1270, 36 L.Ed.2d 114. While the State concedes that it lacks the authority to tax the on-reservation activities of enrolled tribal members or to directly tax reservation lands, it contends that its authority to tax non-Indians on the reservation should be presumed. According to the State, unless Flat Center falls under an exemption to that presumptive authority, the corporate license tax should apply.

¶12    However, the State's position reverses the presumption established by federal Indian law. Indian tribes have long been recognized as distinct, independent political communities qualified to exercise powers of self-government by virtue of their original tribal sovereignty. FELIX S. COHEN'S HANDBOOK OF FEDERAL INDIAN LAW, 232 (1986). Chief Justice John Marshall wrote that Indian tribes are "domestic dependent nations" whose relationship with the federal government resembles that of a ward to a guardian. *Cherokee Nation v. Georgia* (1831), 30 U.S. (5 Pet.) 1, 17. As a consequence of this special relationship between co-equal sovereigns, tribal powers of self-government are limited only by federal statutes, the terms of treaties with the federal government, and by restraints implicit in the nature of the relationship itself -- in all other respects the tribes remain independent and self-governing communities. COHEN'S HANDBOOK, at 235.

¶13    The exercise of state jurisdiction over activities occurring entirely on Indian lands is

5

an infringement on inherent tribal authority and is contrary to principles of self-government and tribal sovereignty. *Williams v Lee* (1959), 358 U.S. 217, 220-23, 79 S.Ct. 269, 271-72, 3 L.Ed.2d 251. In the area of state taxation, where "Chief Justice Marshall's observation that 'the power to tax involves the power to destroy' has counseled a more categorical approach," the exercise of state jurisdiction is even more circumscribed. *County of Yakima v. Confederated Tribes and Bands of Yakima Indian Nation* (1992), 502 U.S. 251, 258, 112 S.Ct. 683, 688, 116 L.Ed.2d 687.

¶14 That is not to say that state taxation is precluded in every instance. There is ample federal authority to the contrary. *See, e.g., Washington v. Confederated Tribes of Colville Reservation* (1980), 447 U.S. 134, 156, 100 S. Ct. 2069, 2083, 65 L.Ed.2d 10; *Moe v. Confederated Salish and Kootenai Tribes of Flathead Reservation* (1976), 425 U.S. 463, 483, 96 S.Ct. 1634, 1646, 48 L.Ed.2d 96. The point here is that the State should not be presumed to wield the sword of on-reservation tax authority absent an express Congressional provision. While we have not previously addressed the precise issue in this case, this Court has repeatedly recognized the need to promote tribal self-determination by deferring to tribal authority on matters of essential importance to tribes and their members. *See, e.g., In re Marriage of Skillen*, 1998 MT 43, ¶ 41, 287 Mont. 399, ¶ 41, 956 P.2d 1, ¶ 41 (recognizing tribal sovereignty and the right of self-government include authority to control the internal relations of tribal members); *Balyeat Law, P.C. v. Pettit*, 1998 MT 252, ¶ 36, 291 Mont. 196, ¶ 36, 967 P.2d 398, ¶ 36 (holding that Montana courts lack subject matter jurisdiction over debt collection action brought by non-Indian creditor whose rights arose on reservation); *In*

6

*re Adoption of Riffle* (1995), 273 Mont. 237, 242, 902 P.2d 542, 545 (holding that the tribe is the ultimate authority on eligibility for tribal membership). Furthermore, we have considered whether tribal membership is critical to a determination of whether the State can tax income earned by Indians on tribal land. *See LaRoque v. State* (1978), 178 Mont. 315, 583 P.2d 1059 (holding that tribal membership was not determinative).

¶15    With these principles in mind, and based on the parties' stipulated facts, we conclude that Flat Center is not subject to the corporate license tax because Flat Center is a tribally chartered corporation owned and operated by Indians, conducts business entirely on the Fort Peck Reservation, and does not "carry on business in this state."

¶16    The State contends that, as a nonmember with a corporate identity distinct from its stockholders, Flat Center does not enjoy the exemptions – the tax shield – from state taxation available to tribes and tribal members. An antecedent question, however, is whether there is statutory authority for taxing Flat Center's activities on the reservation in the first place. Based on the plain language of the corporate license tax, we conclude that there is not. The corporate license tax is an annual fee assessed "for the privilege of carrying on business in this state." Section 15-31-101(3), MCA. Flat Center does not carry on business in Montana. As the stipulated facts indicate, Flat Center does all its business in Indian country. Flat Center's activities occur solely on Indian land owned in fee or held in trust. All of those lands are within the exterior boundaries of the Fort Peck Reservation. In reality, the value the State wishes to tax is generated entirely in a sovereign state. Therefore, Flat Center's income is not earned in Montana.

7

¶17    The State relies heavily on *Baraga Products, Inc. v. Commissioner of Revenue* (W.D. Mich. 1997), 971 F. Supp. 294, *aff'd* (6th Cir. 1998), 156 F.3d 1228, a case which it contends is directly on point. In *Baraga Products*, the court opined that "because a corporation is a legal fiction owing its existence to state law, [plaintiff] is ... not the legal equivalent of a member of the Tribe." *Baraga Products*, 971 F. Supp. at 296.

¶18    However, the published opinion in *Baraga Products* leaves important questions unanswered – the precise language of the Michigan business tax and, contrary to the suggestion in the dissenting opinion, whether significant commercial activity took place outside the Reservation. Furthermore, we have previously held that tribal membership is not essential to a determination of whether income earned on the Reservation is taxable. *See LaRoque*, 178 Mont. at 324, 583 P.2d at 1064.

¶19    In fact, we have in the past given greater weight to the situs of taxable income than the status of the income earner. That was the point of our holding in *LaRoque*. In *LaRoque*, this Court recognized the general rule that individual income earned by an Indian person and derived wholly from reservation sources is exempt from state income tax. *See McClanahan v. State Tax Comm'n of Arizona* (1973), 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129. We then went a step further and held that the income earned on the reservation by non-member Indians is exempt from state taxation. We reasoned that state jurisdiction was limited in "areas set aside by treaty for the exclusive use and control of Indians." *LaRoque*, 178 Mont. at 323, 583 P.2d at 1063. Our determination of whether income could be subjected to state taxation included an analysis of the situs of the activity as well as the status of the Indian as

8

a member or non-member of the tribe. *LaRoque*, 178 Mont. at 324-25, 583 P.2d at 1064.

We held:

> We therefore, conclude that *situs* of the activity is the primary factor in determining whether state taxation jurisdiction exists, not the status of the individual as enrolled or non-enrolled. We read the phrase "reservation Indian" in *McClanahan* to mean Indians residing on the reservation, and not just Indians who are enrolled members of the tribe. We find support for this conclusion in *Fox v. Bureau of Revenue* (1975), 87 N.M. 261, 531 P.2d 1234, cert. den. 424 U.S. 933, 96 S.Ct. 1147, 47 L.Ed.2d 341. In *Fox*, the Court held a Comanche Indian who worked and resided on the Navajo reservation in New Mexico and who was not an enrolled member of the Navajo tribe, was nevertheless exempt from state income taxation. *Fox*, 531 P.2d at 1235. The Court indicated the important factors were the coalescence of situs (reservation) and status (Indian). *Fox* at 1234. The Court could find no cases where the status of the Indian in question as an enrolled tribal member was crucial; in fact, in the cases decided, tribal affiliation was unimportant as situs on a reservation and status as an Indian coalesced.

¶20 The State suggests that subsequent Supreme Court decisions have undercut the logic of *LaRoque* and that non-member Indians are the equivalent of non-Indians for purposes of state taxation. We disagree with this interpretation because we find the cases cited by the State to be materially different from the facts and issue now before us and conclude that the tribal status of the individual or corporation to be taxed may be relevant, but it is by no means dispositive. However, and most importantly, the statutory language pursuant to which the State asserts taxing authority limits that authority based on the situs of the activity from which income is earned. Flat Center, whether it is technically a tribal "member" or not, conducts all its commercial activity and generates all the value that the State now targets for taxation on the Fort Peck Reservation.

¶21 Moreover, analysis based on the totality of the circumstances as done in *LaRoque*

9

would lead to the same result. Both stockholders of Flat Center are enrolled members of tribes served by the Fort Peck Reservation. Kim Murray is an enrolled member of the Fort Peck Tribes. His wife Denise is an enrolled member of the Turtle Mountain Chippewa, a tribe that has allotted lands within the Fort Peck Reservation and whose members receive social services, such as Indian Health Services, offered by the Fort Peck Tribes to enrolled members. The land from which the corporation derives its income is either owned by Indians or held in trust for Indians. Finally, although subsequent to the tax years in question, the Tribes have recognized Flat Center as a tribally chartered corporation. These factors in combination illustrate the strong nexus between Flat Center's activities and the interest of the Tribes in regulating and promoting commercial activity on its Reservation. Put another way, "the coalescence of situs (reservation) and status (Indian)" which guides traditional analysis is present. *See LaRoque*, 178 Mont. at 324, 583 P.2d at 1064.

¶22 For these reasons, the District Court was correct when it concluded that the Montana Corporation License Tax may not be imposed on a tribally chartered corporation which does business entirely within the Fort Peck Reservation. Accordingly, the order of the District Court is affirmed.

/s/ Terry Trieweiler
Justice

We Concur:

_____
Chief Justice

10

_____

_____

_____

_____
                Justices

Justice James C. Nelson specially concurs.

¶23 I concur in our opinion but write separately to submit an additional basis for our conclusion that Montana cannot impose its corporate license tax on Flat Center as a state-chartered corporation.

¶24 In a recent United States Supreme Court case, *Atkinson Trading Co. v. Shirley* (2001), 532 U.S. 645, 121 S.Ct. 1825, 149 L.Ed.2d 889, the Court faced the question of whether the general rule established in *Montana v. United States* (1981), 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493--that, with limited exceptions, Indian tribes lack civil authority over the conduct of nonmembers on non-Indian fee land within a reservation--applies to tribal attempts to tax nonmember activity occurring on non-Indian fee land. The Court, in a unanimous opinion, held that the *Montana* rule did apply and that none of its exceptions obtained. *Atkinson*, 532 U.S. at 647, 121 S.Ct. at 1828-29.

¶25 In the case at bar, we are faced with the converse fact situation--the State attempting to tax business activity of Indians involving non-fee lands and located entirely within the exterior boundaries of the reservation. Nevertheless, the U.S. Supreme Court's analysis in *Atkinson* applies, by analogy.

¶26 The tax at issue in *Atkinson* was an eight percent occupancy tax upon any hotel room located within the exterior boundaries of the Navajo Nation Reservation. While the incidence of the tax fell directly upon the guests--for the most part, tourists going and coming from Grand Canyon National Park--nonetheless, it was incumbent upon the owner or

operator of the hotel to collect and remit the tax to tribal authorities. *Atkinson,* 532 U.S. at 648, 121 S.Ct. at 1829. Atkinson Trading Company, Inc., (Atkinson) the hotel owner, is a corporation owned by non-Indians with its business conducted, and its hotel located upon, non-Indian fee land within the exterior boundaries of the Navajo Reservation. *Atkinson,* 532 U.S. at 648, 121 S.Ct. at 1829.

¶27 Reaffirming the "controlling" principles announced in *Montana*[1] and in *Strate v. A-1 Contractors* (1997), 520 U.S. 438, 117 S.Ct. 1404, 137 L.Ed.2d 661, the Court applied *Montana* "straight up" to conclude that tribal taxation of non-Indians fell within *Montana's* general rule that "Indian tribes lack civil authority over . . . nonmembers on non-Indian fee land." Having, made that determination, the Court then placed the burden on the Navajo Nation (the Tribe) to establish the existence of one of the two *Montana* exceptions. *Atkinson,* 532 U.S. at 654, 121 S.Ct. at 1832.

¶28 To meet its burden the Tribe argued that the first *Montana* exception justified the

---

[1] "Tribal jurisdiction is limited: For powers not expressly conferred them by federal statute or treaty, Indian tribes must rely upon their retained or inherent sovereignty. . . . Indian tribe power over nonmembers on non-Indian fee land is sharply circumscribed. . . . [T]he inherent sovereignty of Indian tribes was limited to 'their members and their territory': '[E]xercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of tribes [which is] necessarily inconsistent with their freedom to determine their external relations.' '[T]he general proposition [is] that the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe.' [These principles, however, are subject to two exceptions:] First, '[a] tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealings, contracts, leases, or other arrangements.' . . . Second, '[a] tribe may . . . exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.'" *Atkinson,* 532 U.S. at 649-51, 121 S.Ct. at 1830-31 (internal citations omitted).

13

imposition of its hotel occupancy tax. Specifically, the Tribe maintained that Atkinson and its guests had entered into a consensual relationship with the Navajo Nation and were the beneficiaries of numerous services--police protection, emergency medical care, fire protection--provided by the Tribe. *Atkinson*, 532 U.S. at 654-55, 121 S.Ct. at 1832-33.

¶29 Importantly for our purposes here, the Supreme Court rejected this argument. While not questioning the Tribe's ability to charge an appropriate fee for a particular service actually rendered, the Court went on to state, "we think the generalized availability of tribal services patently insufficient to sustain the Tribe's civil authority over nonmembers on non-Indian fee land . . . [and that] a nonmember's actual or potential receipt of tribal police, fire and medical services does not create the requisite connection." *Atkinson*, 532 U.S. at 655, 121 S.Ct. 1833.

¶30 In so holding, the *Atkinson* Court narrowed the "consensual relationship" exception of *Montana* by eliminating the providing of incidental or generalized benefits as the sole basis for the tribal sovereign's imposition of taxing authority on those non-Indians who would not otherwise be subject to the tribe's taxing powers.

¶31 This reasoning applies by analogy to the instant case. The Department of Revenue argues that "the State asserts its power to collect the corporation license tax from Flat Center because it [Flat Center] has chosen to avail itself of the advantages of incorporating under the laws of Montana." The Department of Revenue maintains that this fact is "controlling" because when Flat Center incorporated under Montana law, "it obtained certain benefits and

14

agreed to commensurate responsibilities." In the context of the instant case, *Atkinson* begs the question: "What benefits?"

¶32 The Department of Revenue contends that the benefits of incorporating include "estate planning, limitations on personal liability, employee benefits and certain tax benefits." No doubt these are benefits of incorporating. But, importantly, these are generalized benefits of the corporate form of business organization. Virtually every corporation and virtually all corporate shareholders in the United States enjoy these sorts of benefits; these are not benefits peculiar to Montana corporations--even though they may be found in Montana law.

¶33 Under the rationale of *Atkinson*, and by analogy, the fact that Montana business corporations enjoy these sorts of "generalized benefits" no more supports the State's authority to tax a 100% Indian-owned Montana corporation doing business on non-fee property and solely within the reservation than does the provision of generalized benefits by tribal governments sustain the tribe's authority to tax nonmembers doing business on non-Indian fee property within the reservation.

¶34 If the State's hook to tax Flat Center on the reservation is the benefits it enjoys as a Montana corporation--and that seems to be the gravamen of the Department of Revenue's argument--then I submit that the hook is not strong enough to hold the fish. Under *Atkinson* providing generalized governmental benefits to the putative taxpayer is not sufficient to sustain, on a stand-alone basis, the sovereign's taxing authority under circumstances where the sovereign would not otherwise enjoy the power to tax.

15

¶35 If a tribal sovereign may not tax a state corporation owned by non-Indians doing business on fee land within the reservation, I cannot by analogy see how the State can claim any greater authority to tax a state corporation owned 100% by Indians doing business on non-fee land entirely within the reservation.

¶36 While the State might impose a fee or tax incident to the act of incorporating or incident to corporate operations and business conducted off the reservation, in my view, under the facts here, and given the Supreme Court's rationale in *Atkinson*, the State lost its ability to impose its annual license tax on Flat Center.

¶37 I concur.

_____
Justice

Justice W. William Leaphart concurs in the foregoing special concurrence.

_____
Justice

Justice Jim Rice dissenting.

¶38 I respectfully dissent.

¶39 It should be clarified, as the Court notes briefly, that for the only tax year in question, Flat Center was incorporated only as a Montana corporation, as the Tribe had not yet acted in regard to the entity. Thus, Flat Center was solely a creation of the State of Montana. Although emphasized by the parties, Flat Center's charter as a tribal corporation is not relevant to this Court's consideration, as it did not occur until several years after the 1993-1994 tax year in question.

¶40 The Court relies instead on the Indian status of the shareholders of Flat Center, describing Flat Center as an "Indian-owned" corporation. In so holding, the Court ignores the mountain of state and federal authority holding that corporations are separate entities which receive tax treatment without regard to the status of the shareholders, as clearly held in *Moline Properties v. Commissioner of Internal Revenue* (1943), 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499, and in *Baraga Products, Inc. v. Commissioner of Revenue* (W.D. Mich. 1997), 971 F.Supp. 294.

¶41 In *Baraga*, a non-Indian corporation owned by a tribal member and operating completely within the L'Anse Federal Indian Reservation brought action against the State of Michigan, seeking to permanently enjoin the state's levy of a business tax against it. Regarding the status of the subject corporation, the Court stated:

> Plaintiff's counsel conceded at oral argument that as a corporation, plaintiff is not actually an enrolled member of the Tribe. . . . Neither can plaintiff argue that it should be considered an enrolled member simply because its sole

17

shareholder is a member of the Tribe. . . . A corporation cannot take on the form of its shareholder in order to reduce tax liability.

*Baraga*, 971 F.Supp. at 296 (citing *Moline*).

¶42 Further, in *Oklahoma Tax Commissioner v. Chickasaw Nation* (1995), 515 U.S. 450,115 S.Ct. 2214, 132 L.Ed.2d 400, the Supreme Court held that taxing the plaintiff there, a corporation, is not the same thing as taxing the shareholder, a tribal member. The Court reasoned that the proper inquiry was who bore the legal incidence, as opposed to the economic reality, of the tax. Here, it is clear that the legal incidence of the tax falls upon Montana corporation Flat Center, not the shareholders, even though they may ultimately suffer the economic consequence of the tax.

¶43 Under these holdings, the Indian status of Flat Center's shareholders does not determine the outcome of the corporate taxation issue before us. Further, these holdings establish that the Court is impermissibly redefining the character of Flat Center from a Montana corporation to an entity of Indian personage, in order to void the assessment of the Montana corporation tax.

¶44 The Court next turns to a situs analysis to support its conclusion, citing the language in *LaRoque*. The Court unpersuasively turns away the State's argument that the *LaRoque* holding has been virtually eradicated by subsequent decisions of the United States Supreme Court, finding those cases to be somehow "materially different." Instead of circumspectly considering this development in the law, the Court chooses to illogically extend its situs analysis, finding that because all of the economic activity occurred within the reservation,

18

"Flat Center does not carry on business in the State of Montana," and "Flat Center's income is not earned in Montana." Therefore, the Court concludes, Flat Center is not required to pay "for the privilege of carrying on business in this state," despite the mandate of § 15-13-101(3), MCA. I respectfully suggest that it may come as a surprise to many that the Fort Peck Reservation is no longer within the State of Montana, even for tax purposes.

¶45 It was stipulated that Flat Center was voluntarily incorporated as a domestic Montana corporation by its principals, who also elected that the corporation be a "C," or tax-paying, entity, and who have continued to maintain that entity. Despite this elective incorporation by the principals under the laws of the State of Montana, the Court reaches the nonsensical conclusion that Flat Center is within Montana for purposes of *forming* a domestic Montana corporation, but that it is not within Montana for purposes of *paying* the corporate tax assessed against such domestic corporations. "When the [tribal] taxpayer chooses the advantages of incorporation, it must also accept the disadvantages with regard to taxation." *Baraga*, 971 F.Supp. at 296 (quoting *Moline*).

¶46 The Court has ignored the authority which should control the outcome of this case. While the Court correctly states that, absent express federal authorization, reservation lands and Indian income from reservation activities are exempt from state taxation, such is not true, however, for income of non-Indians derived from the reservation. In *Cotton Petroleum Corp. v. New Mexico* (1989), 490 U.S. 163, 109 S.Ct. 1698, 104 L.Ed.2d 209, the Supreme Court held that where a state has not removed itself from providing government services benefitting the taxpayer and reservation residents generally, an otherwise nondiscriminatory

19

tax on a nonmember—a corporation in that case—will be upheld unless Congress has specifically preempted the tax. There was no allegation here that the State of Montana has withdrawn public services or that Congress has specifically preempted the corporate tax in question. Consequently, I disagree with the Court's adoption of policy, stated in ¶ 14, that the State "should not be presumed to wield . . . on-reservation tax authority absent an express Congressional provision." While such a policy may indeed be preferable, the United States Supreme Court has clearly stated that such Congressional action is not a prerequisite for taxation of non-Indian corporations deriving income from the reservation.

¶47 Contrary to the Court, I find *Baraga* persuasive, and for more than its corporate analysis, discussed above. In validating the assessment of Michigan's corporate tax against an Indian-owned corporation operating on the reservation, the *Baraga* Court also analyzed under what conditions a corporation might be immune from state taxation:

> It is possible that a corporation owned by Indian shareholders might be immune from state taxation if it is acting as an equivalent to the Indian tribe itself. For example, a corporation has been held to be entitled to the same sovereign immunity as the Indian tribe when it is organized under tribal laws; it is controlled by the Tribe; and it is operated for government purposes. See *Cohen v. Little Six, Inc.*, 543 N.W.2d 376, 379 (Minn. App. 1996); *Dixon v. Picopa Constr. Co.*, 160 Ariz. 251, 772 P.2d 1104, 1109-11 (Ariz. 1989). Moreover, a corporation may be entitled to the protections of an Indian Tribe if it is acting as the tribe's agent. See *Enterprise Mgmt. Consultants, Inc. v. State ex rel. Oklahoma Tax Comm'n*, 768 P.2d 359 (Ok. 1988). But none of these conditions are present here and plaintiff concedes it is not acting as the Tribe's agent nor is it incorporated under the laws of the Tribe.

*Baraga*, 971 F.Supp. at 296-97.

20

¶48 Pursuant to this authority, and finding none of the conditions that may establish immunity from taxation here, I would find that the Montana corporate tax is validly assessed under federal law, that Flat Center is a Montana corporation which is distinct from its shareholders, and that it is subject to the tax.

¶49 The concurrence argues that under the rationale offered in *Atkinson*, the State has lost its ability to impose the corporate tax on Flat Center. *Atkinson* addressed tribal jurisdiction. State taxation jurisdiction, being a completely different animal, was not addressed in *Atkinson,* and that case offers no instruction, by analogy or otherwise, to the issue here. The concurrence is an attractive policy argument for reciprocity between sovereigns, but is not an application of the federal law which is dispositive here.

¶50 I would reverse.

_____
Justice

Chief Justice Karla M. Gray, concurring.

¶51　I concur in the result reached by the Court, but not in the entirety of its analysis. Specifically, I do not agree with that portion of the Court's approach which appears to simply ignore the fact that a corporation has a legal identity separate from that of its owners, and which treats Flat Center as though it were a sole proprietorship owned by an individual Indian, operating within the confines of the reservation, with the owner directly receiving the income from the business endeavor. My agreement with the Court's result is based on a different, and much narrower approach to the present case.

¶52　I agree that situs is of great importance. But situs is not the sole factor, even under *LaRoque*, where we emphasized the necessity that situs on a reservation and status as an Indian (an individual Indian, in that case) must coalesce. As a result, I agree with much of the dissent's analysis of the importance of recognizing both the factual differences between a corporate identity and an individual, and the legal consequences which ordinarily would flow from those differences. Were it not for an odd anomaly in this case, I would join the dissent.

¶53　Instead, however, I concur in the result reached by the Court because the State stipulated in the District Court to the fact that Flat Center is a tribally chartered corporation. While the stipulation included the additional fact that Flat Center did not become a tribally chartered corporation until after the tax year at issue in this case, the State did not argue in

22

the District Court that, at the relevant times, Flat Center's only corporate existence was pursuant to state law rather than tribal law. Had the State done so, I would have joined the dissent. On this record, however, it is my view that the State is bound by its stipulation, and I would not--and do not--consider any of its legal arguments that essentially attempt to change its position by "undoing" the stipulated fact which provides Flat Center with Indian status.

¶54    I concur in the result reached by the Court.

Chief Justice